Per Curiam:
This case was referred to Trial Commissioner Lloyd Fletcher with directions to make findings of fact and recommendation for conclusions of law. The commissioner has done so in a report and opinion filed on November 18, 1966, in which the facts are stated in the opinion. Plaintiff has filed no exceptions to or brief on this report and the time for so filing pursuant to the Pules of the court has expired. On February 27,1967, defendant filed a motion that the court adopt the commissioner’s opinion and dismiss the petition, to which motion the plaintiff has filed no opposition or response. Since the court agrees with the trial commissioner’s findings, opinion and recommended conclusion of law, as hereinafter set forth, it hereby adopts the same as the basis for its judgment in this case without oral argument. Defendant’s motion to adopt is granted, and since plaintiff is not entitled to recover, its petition is dismissed.
*885 OPINION OP COMMISSIONER*
Fletcher, Commissioner:
In this action review is sought through an assignment of errors of a decision by the Armed Services Board of Contract Appeals (ASBCA No. 6288) denying plaintiff’s claim for increased costs of interior painting performed under a Capehart Housing Contract.
The contract, dated October 2, 1957, called for plaintiff to construct 800 family units in a Capehart project adjacent to Myrtle Beach Air Force Base, Myrtle Beach, South Carolina. The specifications attached to the Invitation for Bid had included certain alternatives. Of importance here was Alternate No. 22, reading in pertinent part:
Furnish and install on walls of all units plaster in lieu of gypsum wallboard as shown on drawings and specified under Section 14 hereinbefore.
* ❖ * % *
d. * * * The finish must be allowed to draw a few minutes and then shall be troweled with water to a smooth finish, free from cat faces and other blemishes.
e. Plaster shall be painted as specified for wallboard.
Plaintiff’s bid, including its quotation on Alternate No. 22, was accepted, and hence the contract, as awarded, provided for plaster walls to be installed throughout the project instead of gypsum wallboard. The specifications with respect to plastering provided, among other things, that:
Samples may be taken by the Contracting Officer at any time from plaster work in place. Areas represented by samples which show over-sanding will be rejected. Sec. 13-18.
It will be noted that Alternate No. 22(e), supra, required that, in painting plastered surfaces, the contractor should follow the painting directions contained in the main body of the specifications relating to wallboard. Insofar as pertinent here, those specifications provided as follows:
Sec. 15-02 (c). If for any reason the painting contractor considers it impossible or impractical to get a first-class job with the materials and methods specified *886 and tinder the conditions involved he shall notify the Contracting Officer through the general contractor, in writing, prior to commencing, that portion of the work and he shall state the conditions he considers unsatisfactory and his recommendation for rectifying them.
* * • * * *
Sec. 15-03 (f). Sand surfaces (except sand finished plastered ceilings) smooth before priming and sand between all coats to produce an even smooth finish.
* íj: # ij:
Sec. 15-07. Wallboard: All wallboard shall be given one coat of high grade resin emulsion sealer, designed specifically for application over gypsum wallboard, equal to Sheetrock Sealer as manufactured 'by the U.S. Gypsum Company.[1] Wallboard shall then be given one coat of “Texolite Primer” tinted to approximate finish color and one finish coat of latex base emulsion paint equal to “Texolite Duraval” as manufactured by the U.S. Gypsum Company.
Plaintiff entered into a subcontract with S. M. Batts for all painting work, both interior and exterior, for a lump sum of $230,700. He commenced painting in the spring of 1958 and within a relatively short period began to experience difficulties. Initially, the problem centered on the painting of wood surfaces, particularly those fashioned from southern pine. When the specified water base paint was applied to those surfaces, an unsightly “fuzzing” or raising occurred in the grain of the wood. The difficulty was overcome by substituting a more expensive oil base paint. Although this added expense was a part of plaintiff’s original claim, it now appears to have been abandoned. On pages 5-6 of its Assignment of Errors, plaintiff states:
Since there is a conflict of testimony concerning whether the original specifications were in accord with “good practice” and, bearing in mind that this appeal is based upon the record below, plaintiff will not press here its claim on account of the improper specifications of the type and kind of paint but will content itself with pressing its claim for loss sustained as a result of the sanding required of it. .
*887 The starting point for the facts underlying the claim for losses sustained through alleged excessive sanding requirements is plaintiff’s letter to the contracting officer dated November 17, 1958. In that letter plaintiff referred to earlier discussions and correspondence concerning painting procedures and materials and, in accordance with Section 15-02 (c) of the Specifications, supra, notified the Government of plaintiff’s view that it was impossible or impractical to obtain a first-class painting job with the materials and methods specified under the conditions involved. The letter first recommended that all woodwork be primed with an oil base primer-sealer, suggested that to obtain, proper protection a third coat of paint should be applied to the exterior surfaces, and, as a final recommendation, stated:
Under the conditions involved, the materials specified and particularly the use of certain darker shades of paint, as per the color schedule furnished us, we do not believe we will be able to obtain a first-class painting job on interior plastered wall surfaces. If it were possible for plastered surfaces to thoroughly cure-out during one complete heating, season, it is possible that two coats of paint would give adequate coverage. Due to the construction schedule involved, this is not possible and there has been evidence of lime spots burning through painted surfaces. To improve this situation, we have recommended that a third coat of paint be installed on interior plastered wall surfaces. At least one living unit has had this third coat application for inspection by your personnel.
The contracting officer responded by a letter dated November 19, 1958, in which he complained that the painting job on the interior plastered walls was not satisfactory and requested plaintiff to enlist the aid of representatives of the paint manufacturer and of the U.S. Gypsum Company.
At plaintiff’s request a technical representative of the paint manufacturer visited the project in an effort to determine the cause of paint discoloration which was occurring on the interior plaster walls. The representative reported that:
* * * moisture is forming on the wall areas as a result of natural drying of the plaster substrate and the high humidity prevalent in the area. This results in *888 condensation which makes the paint film appear darker in spots and in some cases streaky. Since the causes of this condition are natural, there is nothing that can be done at present to offer a satisfactory solution; however, at the time that the units become occupied and permanent heat is turned on, it is quite possible that the condition will disappear.
Nowhere in his report did the technical representative mention the possibility that the troublesome streaking and discoloration was caused by excessive sanding of the plaster walls. However, at the ASBCA hearing, a number of plaintiff’s witnesses, including plaintiff’s project manager and the painting subcontractor’s superintendent, testified that defendant’s inspectors interpreted Section 15-03 (f) of the Specifications, supra, as requiring sanding of the entire plaster wall surfaces both before and after the application of the primer-sealer coat. According to their testimony, this sanding requirement resulted in a breakdown or fracture of the glazed plaster surfaces which, in turn, caused an uneven flotation of the pigment in the paint at the points of fracture. Numerous coats of paint were required to correct this unsightly condition, and even the additional coats were not entirely successful. Although they testified that they protested vigorously over being forced to this “unheard of” sanding practice, neither plaintiff’s project manager nor the painting superintendent were able to identify any Government representative who had directed such overall sanding. Neither could they identify any Government representative to whom they claimed protests had been made. The first written complaint regarding this alleged sanding requirement was made in a letter to the contracting officer dated October 15, 1959 (some two years after work had begun on the project) in support of a request for change order. The letter stated in pertinent part:
Your inspectors forced the painting contractor to sand the plastered walls after the application of the sealer coat, a practice unheard of in the industry and which we bitterly opposed because we knew better and we- informed you that the breaking of the seal would allow moisture content to come through the wall and dampen the plaster, and that it did not make any difference how many coats of paint were applied you would still have a *889 spotty condition. We were using the practice of ‘pointing’ all plaster where necessary prior to the application of the sealer coat.
The testimony by the Government’s witnesses was in direct conflict with the above except in two respects. The witnesses for both sides were in substantial agreement that it would be an undesirable practice to prepare a plaster wall for painting by sanding its entire surface when that surface was already smooth and free of blemishes. To use the description of one Government' witness, sanding a smooth plaster surface would be “ridiculous.” The witnesses were likewise in agreement that the proper use of sanding in preparing a plaster wall is limited to smoothing out or “touching up” rough spots such as repaired areas, cat faces, fish tails, and the like. There was a sharp conflict, however, in the testimony as to what was done during the painting work under the present contract. The Government witnesses denied that either plaintiff or the painting subcontractor had been directed by any Government personnel to sand the entire surface of the plaster walls except in a few isolated instances where, due to hurricane damage and poor workmanship, a relatively small number of walls required so much plaster repair that the entire surface had to be sanded. They further denied that any representative of plaintiff or of the painting subcontractor had ever complained to them that they were being required to perform excessive sanding on the walls. In addition, they testified that, except for the isolated instances mentioned above, they had never observed during their daily inspections that any painter or sander was engaged in sanding an entire plaster wall.
The ASBCA Member who heard all the testimony resolved the evidentiary conflict in favor of the Government. In his opinion he observed:
If sanding had been bitterly opposed and had been a matter of contention from the beginning to the end and was costing a lot of money for the sanders and was spoiling the paint on the walls, it seems to the Board that Mr. Covington [plaintiff’s project manager] would remember the names of persons involved in the controversy. Also, since no letters complaining of the sanding during the year and a half painting was in progress could be *890 presented prior to the letter of 15 October 1959, the evidence is not convincing that the appellant was forced to do something unheard of in the industry which appellant bitterly opposed “because we knew better.” ASBCA No. 6288, p. 15.
The Chairman of the Board, together with two other members of its Division No. 2, concurred with the presiding member in the following ultimate finding:
In view of the conflicting’ evidence and taking into consideration all of the facts and surrounding circumstances together with reasonable inferences arising therefrom, the Board finds that the appellant has failed to present evidence sufficient to establish entitlement to recover its painting claim. The appeal is denied as to this claim. ASBCA No. 6288, p. 22.
Plaintiff here contends that the foregoing finding not only is not supported by substantial evidence; in plaintiff’s view it is contrary to the evidence presented. I cannot agree.
There is substantial evidence in the ASBCA record that the Government supervisors and inspectors did not require, or even expect, the painting subcontractor to sand an already smooth plastered wall either before or after application of the primer coat. There is also substantial evidence in the record that the painting subcontractor in fact did not make it a practice to sand the entire surface of smooth and undamaged plaster walls
It is true that the record contains evidence to the contrary from some of plaintiff’s witnesses. But plaintiff goes much too far in asking, in effect, that this court make an independent evaluation of this conflicting evidence and reverse the Board on the ground that it should have believed one group of witnesses rather than another.[2]
Very recently this court has clearly and concisely summarized the vast body of law which has developed in the judicial review of administrative decisions. See The Confederated Tribes of the Warm Springs Reservation of Oregon v. United States, 117 Ct. Cl. 184 (1966). At pages 207-08, the court stated:
*891 Our task bas not been tlie determination of where the preponderance of the evidence lies; this court does not weigh the evidence independently, but merely examines it to see if there is substantial evidence in the entire record to sustain the Commission’s findings. * * * And once we conclude that there is substantial evidence, we stop. Our imprimatur is one of reasonableness, not rightness.
Questions of interpretation, characterizations, or evidence weighing are outside our scope of review. This court may not substitute its judgment on these matters for that of the Commission. The actual confrontation of the witnesses by the triers of fact precludes our review of inferences unless there is uncontrovertible evidence or physical fact which contradicts the inferences. [Citing cases] And where there is evidence to support either of two fairly conflicting views, this court is not free to set one of them aside, even though the Commission could have drawn the other and been supported by substantial evidence. [Citing cases]
A careful review of the ASBCA record has disclosed evidence sufficient to support either of the conflicting positions taken here. Cf. Gholson, Byars & Holmes Constr. Co. v. United States, 173 Ct. Cl. 374, 351 F. 2d 987 (1965). Following an exhaustive analysis of its entire record, the Board concluded that the Government’s position was the more rational of the two. That decision was reasonable and was supported by substantial evidence. Accordingly, The Confederated Tribes decision, swpra, requires me to “stop.”
Plaintiff is not entitled to recover, and its petition, therefore, must be dismissed.

 The opinion and recommended conclusion of law are submitted pursuant to the order of the court under Rule 57(a). The facts are stated in the opinion.

 Since, as noted, tile awarded contract provided for plaster walls instead of wallboard, this particular requirement for Sheetrock Sealer which is appropriate only for wallboard was deleted by informal agreement. Thus, it is only the remainder of the specification which is involved here.

 “Normally, a reviewing tribunal cannot say from a paper record that a reasonable man must believe one witness rather than another when their testimony conflicts.” Stern, Review of Finding8 of Administrators, Judges and Juries: A Comparative Analysis, 58 Harv. L. Rev. 70, 78 (1944).