**MEGA CONSTRUCTION CO., INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

No. 645–87C.

United States Claims Court.

April 17, 1992.

Lawrence R. Greenberg, Los Angeles, Cal., for plaintiff.

Paul David Langer, Washington, D.C., with whom was Asst. Atty. Gen. Stuart M. Gerson, and David M. Cohen, for defendant.

## OPINION

MOODY R. TIDWELL, III, Judge:

On August 20, 1985, plaintiff, Mega Construction, Inc., entered into a fixed-price construction contract with defendant, through the United States Postal Service, for the construction of the Main Post Office at Canoga Park, California. The contract price was $2,094,900.00, later amended to $2,316,609.68. On September 9, 1985, the Postal Service issued its Notice To Proceed, and on September 17, 1985, Mega commenced work on the project. Originally planned for completion on October 20, 1986, the parties agreed to extend the completion date several times, adding a total of 118 days to the performance period. In December of 1986, cracks were discovered in the poured concrete floor of the Post Office's main workroom which, as a result, failed to conform to the contract specifications. Defendant twice ordered plaintiff to replace the cracked slab, and plaintiff refused on both occasions to comply with the contracting officer's directive. On July 22, 1987, the Postal Service terminated Mega for default.

Following the termination for default, Mega brought suit in this court seeking declaratory judgment that the termination was improper. On December 11, 1987, defendant moved to dismiss for lack of jurisdiction because the contracting officer's decision failed to make a claim for money damages, a necessary prerequisite to the exercise of the court's jurisdiction under the Contract Disputes Act, 41 U.S.C. §§ 601–613 (1988). On December 9, 1987, the contracting officer issued a final decision which assessed partial reprocurement costs, bringing this case within the jurisdiction of the court. Defendant's motion to dismiss was denied. *Mega Constr. Co. v. United States*, 14 Cl.Ct. 555 (1988). Mega submitted a claim for $2,569,380.58 to the contracting officer on August 30, 1988. On September 21, 1988, the contracting officer issued a final decision which assessed $531,495.44 as full excess reprocurement costs against Mega. On November 25, 1988, the contracting officer issued a final decision denying Mega's claim, except for $31,323.30, which was found due. On May 9, 1989, Mega filed its second amended complaint in which it appealed the contracting officer's final decision and presented an affirmative claim to the court in the same amount presented to the contracting officer. Defendant counterclaimed on May 19, 1989, alleging that plaintiff owed $531,-495.44 in excess reprocurement costs as determined by the September 21, 1988, fi-

nal decision of the contracting officer. On October 26, 1989, defendant filed an amended counterclaim increasing the reprocurement costs to $559,460.08. This opinion issues following trial.

## FACTS

Mega is a corporation organized under the laws of California, doing business in that state as a duly licensed general contractor. Mr. Marvin Kaplan is president of Mega, and his assistant, Mr. Barry Harmon was Mega's Construction Manager during the contract in question. As the general contractor, Mega was responsible for coordinating and managing the work of the various subcontractors on the job site.

Among the many tasks that Mega performed under the contract was the installation of a poured-concrete (non-prestressed), non-structural, slab on grade measuring approximately 22,000 square feet that was to be the floor of the Canoga Park Main Post Office.[1] The contract specifications required a slab four inches thick, with No. 4 steel reinforcing bars (rebar) embedded in a checkerboard pattern, twenty-four inches apart and at least one inch from the upper surface of the slab. As the slab was non-structural, the rebar was present to prevent cracking as the concrete shrank, not to serve as reinforcement. The contract drawings required Mega to run the rebar through control joints, placed approximately every thirty-seven feet in a north-south direction, and approximately every twenty-nine feet in an east-west direction. A control joint is any purposeful break made in the concrete to control cracking. One type of control joint consists of a galvanized steel stake embedded approximately one inch below the surface of the concrete. After the concrete is poured and cured, the stake acts as a controlled break in the concrete to prevent and contain cracking as the concrete cures. As one structural engineering expert noted at trial, the lines that appear every three to four feet in sidewalks perform the same function, but, for aesthetic reasons, owners normally do not want lines every three to four feet in their floors. Therefore, the steel stakes are used. Control joints may appear in different forms. In Mega's case, they were called "Key–Kold" joints.

The slab sat atop two inches of sand that covered a layer of 6 MIL plastic vapor barrier. The vapor barrier covered another two inches of sand. The layers of sand rested on approximately five to six feet of compacted fill. After the slab cured, it was to be covered with an asphalt tile. Because the slab was non-structural, its most important feature was its ability to endure the weight of loaded mail carts weighing between 300 and 2000 lbs., as well as substantial foot traffic. The soils engineering firm of R.T. Frankian & Associates specified to the structural engineering subcontractor that designed the floor for defendant, Martin & Kelsen, Inc., that the fill under the slab was to be non-expansive, meaning that it was not to expand if, for example, water seeped into the fill due to heavy rains or a broken pipe. According to Mr. Rudolph Paolini, an architect with the firm of Wagner, Hohns & Inglis, and one of the government's expert witnesses, a non-expansive soil is composed of a proper mixture of small, medium, and large grains, which is then compacted according to specifications. If water seeps into a properly mixed fill, the large and medium particles will provide space for the water, thereby preventing the fill from expanding and causing the slab on top to shift and crack. If fill is comprised of too many small grains, after compaction, water has no place to seep, and is simply absorbed into the fill like water in a dry sponge. For example, if the fill is five feet deep and experiences a 3 percent expansion, the fill will expand three inches, which in turn, will cause substantial movement, and therefore cracking, in the slab above. Although R.T. Frankian & Associates prescribed that the fill under the slab was to be non-expansive, the evidence of record

---

1. A non-structural slab on grade is a slab that rests on the ground. It is non-structural because the building will not weaken if, for example, the slab were found to be defective. A structural slab rests on columns, as in a multi-story building. If a structural slab is defective, the integrity of the entire building may be compromised.

failed to reveal whether R.T. Frankian & Associates, or Martin & Kelsen, performed a soils test prior to installation of the slab to determine whether it was non-expansive. Mega installed and compacted the fill, but the record did not indicate whether it performed a soils test prior to pouring the slab.

The floor of the building's main workroom, measuring approximately 10,300 square feet, comprised the largest section of the slab. In December of 1986, cracking, and, in at least one area, vertical displacement, was discovered in the main workroom portion of the slab. Differential settlement is a severe form of cracking in which one side of a crack sinks, resulting in a rough, uneven floor. On January 16, 1987, defendant's architect, Lane Architectural Group (Lane), sent Mr. Gordon Kelsen, of Martin & Kelsen, to inspect the slab. In a January 27, 1987, letter to Mr. Edward Jones, Jr., Lane's manager for the Post Office project, Mr. Kelsen recommended coring the areas of vertical displacement to obtain a sample of the slab in the hope of determining the cause of the cracking. Mr. Kelsen also stated that the cracks and vertical displacement did not affect the structural integrity of the building, but that repairs should be effected for "architectural considerations."

On February 26, 1987, the contracting officer, Mr. Joseph M. Cipriani, directed Mega to investigate the cracks and differential settlement of the slab. By letter of March 10, 1987, Mr. Harmon, Mega's Construction Manager, protested that physical testing was the owner's responsibility, and that Mega was "unwilling to expend costs in connection with" testing. However, Mr. Harmon also stated that Mega was "more than willing to furnish all necessary facilities, labor, material and equipment to accommodate all such removal, tearing out and/or replacement, understanding that [the Postal Service's] endorsement would equitably adjust the contract price should the examination substantially reflect conformance." As the cracks worsened, Mr. Cipriani rejected the slab by letter of March 27, 1987, pursuant to General Provision 51 of the contract, *Inspection and Acceptance*.[2] Mr. Cipriani directed Mega to remove a section of the cracked portions of the slab under the supervision of Mr. Kelsen, and submit soil and concrete samples for testing. Mr. Cipriani also ordered that all work related to the removal and testing of the slab section was to be performed at no additional cost to the Postal Service, pursuant to the terms of General Provision 51.

The trial record demonstrated that the extent of the cracking in the slab was extensive, with at least four cracks running the entire distance of the workroom portion of the slab in an east-west direction, and numerous other smaller east-west cracks as well. There were also at least ten smaller north-south cracks running through this area of the slab. Some of the cracks, ac-

---

**2.** General Provision 51, *Inspection and Acceptance*, states in pertinent part:

(b) The Contractor shall, without charge, replace any material or correct any workmanship found by the Postal Service not to conform to the contract requirements, unless in the public interest the Postal Service consents to accept such material or workmanship with an appropriate adjustment in contract price. The Contractor shall promptly segregate and remove rejected material from the premises. (c) If the Contractor does not promptly replace rejected material or correct rejected workmanship, the Postal Service (1) may, by contract or otherwise, replace such material or correct such workmanship and charge the cost thereof to the Contractor, or (2) may terminate the Contractor's right to proceed in accordance with the "Termination for Default" clause of these General Provisions.

(d) The Contractor shall furnish promptly, without additional charge, all facilities, labor, and material reasonably needed for performing such safe and convenient inspection and test as may be required by the Contracting Officer.... (e) Should it be considered necessary or advisable by the Postal Service at any time before acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the Contractor shall, on request, promptly furnish all necessary facilities, labor and material. If such work is found to be defective or nonconforming in any material respect, due to the default of the Contractor or his Subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction.

cording to Mr. Cipriani, were approximately three-sixteenths of an inch wide. According to Mr. Philips T. Ruffalo, a structural engineer under contract to defendant as its on-site representative and project manager, some of the cracks were typical hairline cracks, while others were large enough in places to view the sand beneath the slab. It was also clear from testimony at trial that the cracks worsened in both length and width between December 1986, and June 1987.

After the cracks in the slab appeared, the Postal Service contracted with a number of architectural and engineering firms to obtain independent appraisals of the cracking. One such firm, Pacific Architects and Engineers (PAE), retained Mr. Paul Winter, a structural engineer, to examine the slab design and specifications, and inspect slab. He concluded that the cracking was due to the wide spacing of control joints in the slab's design. Mr. Winter stated in his letter of March 30, 1987, to PAE that

> control joints in the main area of the building occur at from [sic] 30 to 37½ feet on center.... 'Textbook' spacing of control joints varies from 15 to 20 feet on center.... Shrinkage cracks will always occur in non-prestressed slab on grade, and control joints are provided to confine the cracks to pre-determined locations.

Echoing Mr. Kelsen, Mr. Winter recommended filling the cracks with non-shrink grout and replacing small areas where vertical displacement was apparent.

Mr. Richard Levitt of Wagner, Hohns, Inglis, Inc., another engineering firm retained by the Postal Service, also inspected the slab. In a memorandum to the file dated March 24, 1987, Mr. Levitt stated:

> The concrete slab ... had cracks as had been reported, mostly midway between the joints at approx. 20 foot spacings. Looks like an expansive soil problem or insufficient reinforcing in the design or construction. Most of the cracks are of no consequence.... Otherwise, the momentum observed today tells me it would not be a good time to terminate the contract, if that is being considered.

On May 14, 1987, Mega removed a four-foot-by-ten-foot section as directed by Mr. Cipriani in his letter of March 27, 1987. Mr. Kelsen reported in a letter to Lane that most of the rebar in the section lay in the sand under the floor, and was not embedded at least one inch from the top of the slab as required by the contract. Mr. Kelsen also reported that no "Key–Kold" control joint was present, although the contract drawings indicated that a "Key–Kold" joint was to be used at that location. Both parties agreed, and the photographs taken of the excavated section overwhelmingly demonstrated, that the installation of the rebar in the sample section did not conform to the contract specifications. Mr. Kelsen's letter recommended filling the cracks with a non-shrink material, and using one-inch-deep saw cuts in place of control joints to prevent further cracking.

On June 8, 1987, Mr. Cipriani met at the jobsite with Mr. William Peterson, senior structural engineer with the architect and engineering firm of Daniel, Mann, Johnson & Mendenhall, to seek yet another independent appraisal of the cracking. As Mr. Kelsen had observed, Mr. Peterson's report on the visit stated that, in the section of slab that was cut for sampling, the rebar had fallen under the slab. In contrast to Mr. Kelsen's report, Mr. Peterson noted that control joints were present, though improperly placed. According to Mr. Peterson, the control joints were placed too low, and were parallel to columns, rather than intersecting the column corners as specified in the contract drawings. Mr. Peterson also concluded that the fill underneath the slab was of proper quality and had been compacted sufficiently to ensure that the slab had not shifted unreasonably due to poor soil quality.

In a June 9, 1987, letter to defendant, Mr. Alan Wing of R.T. Frankian & Associates, presented the results of a test from the soil beneath the four-foot-by-ten-foot section of the slab. R.T. Frankian & Associates tested two samples, one from six inches below the slab and another from fifteen inches below the slab. The tests concluded that the subgrade soils were non-expansive, meaning that there was lit-

tle probability that the soils would expand with moisture and ultimately cause the slab to crack.

On June 17, 1987, Mr. Cipriani again concluded that the workroom portion of the slab did not conform to the contract specifications. Pursuant to the *Inspection and Acceptance* clause of the contract, Mr. Cipriani rejected the workroom portion of the slab and directed Mega to remove and replace it. Mr. Cipriani also ordered Mega to provide the Postal Service with a plan and schedule for this work within seven days of Mega's receipt of the directive. In its response dated June 26, 1987, Mega requested copies of the various structural engineering reports that the Postal Service had obtained from Messrs. Kelsen, Winter, Levitt, and Peterson, suspecting that some or all of the reports recommended repair of the cracks rather than removal of the slab. While alleging that these reports were necessary to comply with Mr. Cipriani's directive of June 17, 1987, Mega's response failed to provide a plan for the removal and replacement of the slab. Mr. Cipriani did not provide Mega with any of the government's reports.

On July 9, 1987, Mr. Cipriani again ordered Mega to remove and replace the slab, and to provide a plan to do so within five days of receipt of the letter, or Mega would be subject to termination for default. Mr. Cipriani also informed Mega's surety, Fidelity & Deposit Company of Maryland, that grounds for default termination existed under the contract due to Mega's failure to comply with the directive of June 17, 1987. In response to Mr. Cipriani's letter of June 26, 1987, plaintiff's attorney wrote to Mr. Cipriani on July 14, 1987, reiterating Mega's request for the reports and disputing Mr. Cipriani's rejection of the slab. Plaintiff's attorney, at the time, who apparently did not grasp the critical position of his client, stated that, "Mega is prepared to work with you to evaluate whether a problem exists, and if so, how to solve it, but you must be prepared to cooperate." Mega again failed to comply with the contracting officer's directive. On July 22, 1987, Mr. Russell W. Harter, Mr. Cipriani's supervisor, and also a contracting officer, terminated Mega for default based upon lack of action, job abandonment, and failure to follow directives of the contracting officer. The evidence of record demonstrated that the project was between 85 and 95 percent complete at the time of termination.

After terminating Mega for default, defendant undertook negotiations with the surety to complete the project. The surety refused, and on December 11, 1987, the Postal Service contracted with B.G. Construction Company to complete the remainder of work under Mega's contract, including demolition of the old slab and installation of a new workroom floor.

Fidelity & Deposit of Maryland retained the Construction Consulting Group, Inc., a subsidiary of the American Concrete Institute, to perform tests on the slab to determine whether the remainder of the rebar in the slab was positioned properly. Before demolition, Mr. Edward R. Fiske of the Construction Consulting Group, Inc., used an electronic device known as a pachometer to determine the distance of the rebar from the center of the slab in eighty locations. According to Mr. Fiske's report, 19 percent of the rebar was not positioned in the concrete according to contract specifications. In contrast, Mr. Rudolph Paolini, an architect with the engineering firm of Wagner, Hohns, Inglis, Inc., and the government's expert witness on concrete slabs, was present during the demolition of workroom slab. He testified that he saw approximately 80 percent of the rebar lying on the sand under, not in, the slab.

After Mega's termination for default, the Postal Service contracted with the soils engineering firm of Smith–Emery to perform a series of tests on the soils beneath the slab. In August 1987, Smith–Emery tested nine samples and concluded that the soil under the slab had been compacted according to contract specifications, and that

> soils are not the cause of the cracks observed in the slab ... It is our opinion that the cracks in the concrete slab are due to the reinforcing steet [*sic*] not located at the proper depth in the slab

and the lack of expansion joints around the columns and at other appropriate locations in the slab.

On September 28, 1987, Fidelity & Deposit Company of Maryland also contracted with Smith–Emery to investigate the soil beneath the slab. Smith–Emery tested nineteen samples and concluded, for the second time, that the fill soils were "not the cause of the distress observed in the floor slab ... [t]he fill soils have a low expansion potential." The architectural and engineering firm on reprocurement, Joncich, Sturm & Associates, also contracted with Smith–Emery to investigate the soils. Between October 26, and 27, 1987, Smith–Emery extracted and tested samples from ten locations under the slab. In stark contrast to its reports of August and September, Smith–Emery concluded in its report of November 3, 1987, that boring locations one, five, seven, nine, and ten exhibited a medium potential for soil expansion, while locations two, three, four, and six exhibited a low potential for expansion.

According to the testimony of Mr. Cipriani, the Postal Service determined that it would order a redesign of the slab based on Smith–Emery's conclusions that the soil placed by Mega under the existing slab was expansive in the low-to-medium range. In a November 13, 1987, letter to the Postal Service, Mr. Kelsen, who re-designed the slab, stated:

Recent tests by Smith–Emery indicate potentially expansive soil in the low to medium range. We have increased the slab thickness and the amount of slab reinforcing due to these tests. If the compacted fill had tested non-expansive, we would have recommended replacement with the same slab and reinforcing as shown on the [original] contract documents.

On the reprocurement, Mr. Kelsen increased the thickness of the slab to five inches, placed the rebar eighteen inches apart rather than twenty-four, and spaced control joints approximately twenty-five feet apart. On November 6, 1987, Mr. Cipriani met with Messrs. Ruffalo, Kelsen, and Paolini, among others, to discuss possible solutions to the cracking in the slab. None of the consultants at the meeting recommended removing and replacing the slab in the main workroom, and indeed, all advanced theories on how to solve the cracking in the slab through filling and grinding.

After Mega's termination for default, Joncich, Sturm & Associates, discovered over 400 construction deficiencies in other areas of the project. B.G. Construction completed the project in six months for $559,460.08. The Postal Service took beneficial occupancy on June 6, 1988.

## DISCUSSION

Default termination is a drastic sanction, and should be imposed only on the basis of solid evidence. *Sun Cal, Inc. v. United States*, 21 Cl.Ct. 31, 39 (1990) (citing *Lisbon Contractors, Inc. v. United States*, 828 F.2d 759 (Fed.Cir.1987)); *J.D. Hedin Constr. Co. v. United States*, 408 F.2d 424, 431, 187 Ct.Cl. 45 (1969). It is a type of forfeiture. *De Vito v. United States*, 413 F.2d 1147, 1153, 188 Ct.Cl. 979 (1969). Nevertheless, it is well settled that the contracting officer possesses authority to terminate the contract. *Schlesinger v. United States*, 390 F.2d 702, 707, 182 Ct.Cl. 571 (1968). The government bears the burden of proof, by a preponderance of the evidence, to establish that the default termination was justified. *Lisbon Contractors, Inc.*, 828 F.2d at 765.

Pursuant to General Provision 4 of Mega's contract, all claims arising under the contract were subject to the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (1988). In proceedings under the CDA, "the facts, as well as the law, are decided *de novo* by the ... court." *Seaboard Lumber Co. v. United States*, 903 F.2d 1560, 1562 (Fed.Cir.1990), *cert. denied*, —— U.S. ——, 111 S.Ct. 1308, 113 L.Ed.2d 243 (1991) (citing 41 U.S.C. § 609(a)(3) (1988)); *accord, Assurance Co. v. United States*, 813 F.2d 1202, 1206 (Fed.Cir.1987). "The court is not bound by either the findings of fact or the conclusions of law of the [contracting officer]." *Lathan Co. v. United States*, 20 Cl.Ct. 122, 125 (1990).

*Defective Workmanship*

█ In the instant case, contract clause 3.07, *Defective Concrete*, of section 03300, *Concrete Work*, stated that "[a]ny concrete not in accordance with these specifications, ... or showing cracks, [or] ... exposed reinforcing ... will be considered defective.... Correct and replace defective concrete as directed by the Architect at no additional cost to the Owner." In addition, the contract drawings called for the rebar to be placed one inch from the top of the concrete. Without exception, the architectural and structural engineering experts who testified at trial agreed that concrete shrinks when it cures, and that hairline cracks in poured concrete slabs are normal occurrences. However, the evidence presented at trial also demonstrated that the cracks in defendant's slab were far more than mere hairline cracks. It was uncontroverted that at least four of the cracks ran the entire length of the slab, and that some were so wide, the sand under the slab was visible. Mr. Paolini, who observed the demolition of the slab firsthand, testified that some 80 percent of the rebar lay exposed in the sand beneath the slab. Mega was in clear and incontrovertible violation of contract clause 3.07. "[T]he Government, just as any other party, is entitled to receive that for which it contracted and has the right to accept only goods that conform to the specifications." *Cascade Pac. Int'l. v. United States*, 773 F.2d 287, 291 (Fed.Cir.1985) (citing *American Elec. Contracting Corp. v. United States*, 579 F.2d 602, 608, 217 Ct.Cl. 338 (1978)). The court finds that defendant properly terminated Mega for default on this basis.

The record made it clear that the cracking was caused by Mega's failure to install the rebar according to the contract specifications. Mr. Kelsen, the designer of the slab stated that the purpose of the rebar was to control shrinkage cracking. All the expert testimony confirmed this elementary principle of concrete engineering. Ample photographic evidence revealed that most of the rebar in the four-foot-by-ten-foot section that Mega removed on May 14, 1987, was not inserted through the holes of the "Key–Kold" control joints and that control joints were either absent or improperly placed. Mr. Kaplan conceded that the rebar in this section was found in the sand and that Mega did not install it in accordance with the contract specifications. Compared to the candid and highly credible testimony of Mr. Paolini's firsthand observations, the court found Mr. Fiske's pachometer tests to be unpersuasive. Had Mega installed the control joints properly, the rebar would have run through the preformed holes in the control joints according to the specifications, which in turn would have secured the rebar in its proper position. Properly placed, the rebar would have functioned as designed to control excessive shrinkage cracking and differential settlement as the concrete cured.

According to the deposition of Mr. James Hearn, Mega's on-site project superintendent, Amber Steel, Mega's subcontractor, placed the rebar in a checkerboard fashion.[3] Before the concrete was poured into the wooden forms, the rebar was elevated on masonry blocks so that the rebar was raised three and one-half inches from the sand. The rebar was then tied together with wire at every joint where it intersected. Mega's pumping subcontractor poured the concrete from six-inch hoses, swaying the hoses to and fro as it spread the concrete over an ever-widening area of floor. Mr. Hearn was present during the entire concrete pour and observed that at least one masonry block fell during the pouring, causing the rebar in that area to sag. He also noted that some concrete accumulated atop the rebar, causing the rebar to sag at its midpoints, between blocks. However, he also stated that these instances of misplaced and sagging rebar were corrected immediately, and he failed to note any significant problem of rebar support in his daily log. According to the testimony of Messrs. Cipriani and Paolini, the concrete

---

3. Mr. Hearn was unavailable to testify at trial, consequently his deposition was entered into evidence.

pouring from the six-inch hose tumbled many of the blocks that supported the rebar, thus causing the rebar to fall into the sand. Based on Mr. Hearn's firsthand account of the crucial concrete pours, the court was not persuaded by Messrs. Cipriani and Paolini that Mega's carelessness in pouring the concrete was the principal cause of the misplaced rebar. Rather, Mega's slipshod placement of control joints caused the rebar to fall from its proper position.

Nor was the court convinced that the cracking of the slab was due to the expansive nature of the soils beneath the slab. While Smith–Emery's November 3, 1987, report found the soils to be of low and medium expansiveness, there was no evidence to prove seepage into the fill or expansion of the soils under the slab. In the absence of any evidence of actual seepage and expansion, the court finds that the soils beneath the slab did not cause the cracks, even though the soils did not meet the contract specifications.

Mr. Cipriani testified that the slab design used at the Canoga Park Main Post Office was the same design used in dozens of Post Offices in California. While "textbook" spacing of control joints in a slab of this type, according to Mr. Winter, is fifteen to twenty feet apart, defendant's design called for spacing of thirty-nine feet and twenty-nine feet between control joints. Although the design of the slab was changed on the reprocurement, increasing the thickness to five inches, placing the control joints closer together, and decreasing the rebar from twenty-four to eighteen inches apart, the court disagreed with plaintiff's argument that the redesign proved that the original design was defective. As a result of the tests showing the soils to be of low-to-medium expansiveness, the Postal Service redesigned the slab as a safeguard against the effects of future soil expansion. The court agreed with Mr. Cipriani's common sense observation that redesigning the slab was less expensive than removing approximately 50,000 cubic feet of defective fill from the pre-existing structure and replacing it with the same amount of non-expansive soil. Moreover, according

to the deposition of Mr. Hearn, it was not uncommon for rebar to be spaced at twenty-four inches, as demonstrated by the pre-formed cut-outs on the control joints that were located at twelve, sixteen, and twenty-four inches.

Mega argued that the termination for default was improper because specifications for the slab were defective. Government liability for faulty design specifications is well settled. "[I]f the contractor is bound to build according to plans and specifications prepared by the owner, the contractor will not be responsible for the consequences of defects in the plans and specifications." *United States v. Spearin*, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918).

> When the Government contracts for supplies to be manufactured in accordance with Government specifications, there is an implied warranty that if the specifications are followed, a satisfactory product will result. If the warranty is breached, i.e., the specifications are defective, the plaintiff is entitled to damages equal to the amount expended in trying to comply with the defective specifications.

*Hol–Gar Mfg. Corp. v. United States*, 360 F.2d 634, 638, 175 Ct.Cl. 518 (1966) (citations omitted).

In particular, this court has stated that the "implied warranty of adequacy of specifications applies only to design specifications such as detailed measurements, tolerances, materials, *i.e.*, elaborate instructions on how to perform the contract...." *Stuyvesant Dredging Co. v. United States*, 11 Cl.Ct. 853, 860, *aff'd*, 834 F.2d 1576 (Fed.Cir.1987). Here, the government issued the architect's and engineer's blueprints for the project which Mega was not at liberty to change. In fact, Mega's contract stated: *"NO INDIVIDUAL IS AUTHORIZED TO CHANGE ANY PROVISION OF THE SPECIFICATIONS WITHOUT WRITTEN AUTHORIZATION OF THE CONTRACTING OFFICER...."* General Provision 2(a).

The Federal Circuit has refined the *Spearin* test by requiring the court to inquire

whether the contractor complied fully with the design specifications that it asserted were defective. *Al Johnson Constr. Co. v. United States*, 854 F.2d 467, 469 (Fed.Cir. 1988). If the contractor failed to comply fully with even faulty design specifications, recovery on the implied warranty is precluded. Here, the evidence is overwhelming that Mega did not position the rebar and control joints according to the specifications. Therefore, even if the contract specifications were defective, which the court does not find, plaintiff is precluded from recovery based on the government's implied warranty because Mega failed to comply fully with the design specifications.

■ Furthermore, General Provision 4(h) of the contract, *Claims and Disputes*, also bound Mega to follow Mr. Cipriani's directives. "Except as the parties may otherwise agree, pending final resolution of a claim by the Contractor arising under the contract, the Contractor shall proceed diligently with the performance of the contract in accordance with the Contracting Officer's decision." On June 16, and July 9, 1987, Mr. Cipriani directed Mega to submit a plan to remove and replace the rejected slab. Mega failed to comply with the directive, complaining that it could not proceed unless Mr. Cipriani forwarded the consultants' reports. Mega implied that Mr. Cipriani withheld these reports in bad faith because he sought to prevent Mega's compliance, thereby obtaining a new slab at no additional cost to the Postal Service. Mega contended that Mr. Cipriani was under pressure from his superiors to finish the project, which had taken more time and money than normally required for similar projects, and therefore had an ulterior motive for terminating Mega for default without sufficient cause. Mega argued that the November 6, 1987, meeting, at which defendant discussed repair of the slab with its consultants, proved that the directives to remove and replace the slab were an artifice to terminate Mega.

The court finds Mega's argument unconvincing. First, even if Mega disagreed with the directives, it was bound by General Provision 4(h) of the contract to proceed

in accordance with Mr. Cipriani's letters of June 17, and July 9, 1987. The contract terms required Mega to submit a plan pursuant to the contracting officer's directive and then seek an equitable adjustment to the contract, with the right to appeal the contracting officer's decision to the Postal Service Board of Contract Appeals or this court. General Provision 4(e)(i)(ii); *Skip Kirchdorfer, Inc. v. United States*, 229 Ct.Cl. 560, 564 (1981). Mega never submitted a plan pursuant to the directives, but rather made demands on the contracting officer. Mega was properly terminated for default because it refused to comply with Mr. Cipriani's directive. *Stoeckert v. United States*, 391 F.2d 639, 645, 183 Ct.Cl. 152 (1968).

■ Second, the coveted consultants' reports evaluated possible repair of the slab, not its removal and replacement, and therefore, were irrelevant to Mr. Cipriani's directives. In an effort to protect the best interests of the government, Mr. Cipriani rightfully demanded a relatively crack-free slab, not a defective slab that had been repaired, even in the face of contrary advice of expert architects and engineers. The government is entitled to strict compliance with the contract requirements. *Jet Constr. Co. v. United States*, 531 F.2d 538, 543, 209 Ct.Cl. 200 (1976); *Farwell Co. v. United States*, 148 F.Supp. 947, 949, 137 Ct.Cl. 832 (1957); *Martin J. Simko Constr., Inc. v. United States*, 11 Cl.Ct. 257, 268 (1986), *vacated in part on other grounds*, 852 F.2d 540 (Fed.Cir.1988). It is the contracting officer, and not independently retained experts, who is commissioned to protect the best interests of the United States in matters of government procurement.

■ Third, under the facts presented, Mr. Cipriani was under no obligation to pass the consultants' reports to Mega, and his failure to do so did not undermine Mega's ability to perform. There is an implied duty in contract law that both parties will cooperate and refrain from hindering each other's performance. *L.L. Hall Constr. Co. v. United States*, 379 F.2d 559, 563, 177 Ct.Cl. 870 (1966); *Cedar Lumber*,

*Inc. v. United States,* 5 Cl.Ct. 539, 549 (1984). To determine if a party breached this obligation, the court must analyze the reasonableness of a party's actions in the particular context. *Commerce Int'l. Co. v. United States,* 338 F.2d 81, 85, 167 Ct.Cl. 529 (1964). Even if the consultants' reports would have made Mega's tasks under the directive easier, which they would not have, Mega was not stranded, as plaintiff would have the court believe. Messrs. Kaplan, Harmon, and Hearn, all highly qualified construction professionals, were quite capable of submitting a plan to Mr. Cipriani that satisfied the directive while including recommendations for repair of the cracked slab. If plaintiff believed that expert evaluations would have aided in complying with Mr. Cipriani's directive, it was incumbent upon Mega to hire such experts. The court suspects, however, that Mega was more interested in using the conclusions of the consultants' reports as an arrow in its quiver to take aim at Mr. Cipriani's decision, rather than to assist Mega in complying with the directive. The court is convinced that Mr. Cipriani did not hinder Mega's performance under the contract. *See PBI Elec. Corp. v. United States,* 17 Cl.Ct. 128, 135 (1989).

Finally, although Mega implied bad faith on the part of Mr. Cipriani, it was unable to produce the well-nigh irrefragable proof necessary to dislodge the presumption that public officials act in good faith. *Darwin Constr. Co. v. United States,* 811 F.2d 593, 595 (Fed.Cir.1987); *McEachern v. Office of Personnel Management,* 776 F.2d 1539, 1544 (Fed.Cir.1985); *Sanders v. United States Postal Serv.,* 801 F.2d 1328, 1331 (Fed.Cir.1986). The court need not tarry on Mega's unsupported suggestions of bad faith.

The contracting officer's decision to terminate Mega for default also was supported by well-documented evidence of Mega's deficiency in other areas of the contract. As noted above, the record demonstrated well over 400 instances of deficient work that were discovered on the reprocurement by Joncich, Sturm & Associates. Although it is unnecessary to specify these numerous construction deficiencies,

the court simply notes that they provided ample evidence to support Mr. Cipriani's decision to terminate Mega for default. Any existing reasons supporting a default termination are sufficient to sustain the default, even if not discovered until after the decision to terminate for default is made. *College Point Boat Corp. v. United States,* 267 U.S. 12, 16, 45 S.Ct. 199, 201, 69 L.Ed. 490 (1925); *Pots Unlimited, Ltd. v. United States,* 600 F.2d 790, 793, 220 Ct.Cl. 405 (1979); *Samuel T. Isaac & Associates, Inc. v. United States,* 7 Cl.Ct. 255, 258 (1985); *Joseph Morton Co. v. United States,* 3 Cl.Ct. 120 (1983), *aff'd,* 757 F.2d 1273 (Fed.Cir.1985).

*Delay*

Plaintiff argued that Mega was entitled to damages for approximately 270 days of delay on the project. It is black letter law that every contract with the government contains an implied obligation that neither party will do anything to prevent, hinder, or delay performance. *Lewis–Nicholson, Inc. v. United States,* 550 F.2d 26, 32, 213 Ct.Cl. 192 (1977). The government breaches this implied obligation when delay occurs because of the government's foreseeable or excessive unpreparedness in the performance of its contractual obligations. *Roberts v. United States,* 357 F.2d 938, 174 Ct.Cl. 940 (1966). Therefore, when the government's actions delay performance and increase costs, the contractor is presented with a viable claim for damages. *Lewis–Nicholson,* 550 F.2d at 26. However, as the Court of Claims has held, "no matter how unreasonable the Government's delay, there can be no recovery without proof that the delay caused material damage." *Commerce Int'l Co. v. United States,* 338 F.2d 81, 89, 167 Ct.Cl. 529 (1964). "Where both parties contribute to the delay 'neither can recover damage, unless there is in the proof a clear apportionment of the delay and the expense attributable to each party.'" *Blinderman Constr. Co. v. United States,* 695 F.2d 552, 559 (Fed.Cir.1982) (quoting *Coath & Goss, Inc. v. United States,* 101 Ct.Cl. 702, 714–15 (1944)). "Generally, courts will deny recovery where the delays are 'concurrent

or intertwined' and the contractor has not met its burden of separating its delays from those chargeable to the Government." *Blinderman Constr. Co.*, 695 F.2d at 559.

Not only must plaintiff disentangle its delays from the government's to the satisfaction of the court, but the delays must have affected activities on the critical path. The Court of Claims described critical path method analysis as

> an efficient way of organizing and scheduling a complex project which consists of numerous interrelated separate small projects. Each subproject is identified and classified as to the duration and precedence of the work. (E.g., one could not carpet an area until the flooring is down and the flooring cannot be completed until the underlying electrical and telephone conduits are installed.) The data is then analyzed, usually by computer, to determine the most efficient schedule for the entire project. Many subprojects may be performed at any time within a given period without any effect on the completion of the entire project. However, some items of work are given no leeway and must be performed on schedule; otherwise, the entire project will be delayed. These latter items of work are on the "critical path." A delay, or acceleration, of work along the critical path will affect the entire project.

*Haney v. United States*, 676 F.2d 584, 595, 230 Ct.Cl. 148 (1982).

The Claims Court has noted that determining the critical path is essential to determining damages.

> The reason that the determination of the critical path is crucial to the calculation of delay damages is that only construction work on the critical path [has] an impact upon the time in which the project [is] completed. If work on the critical path [is] delayed, then the eventual completion date of the project [is] delayed. Delay involving work not on the critical path generally [has] no impact on the eventual completion date of the project.

*G.M. Shupe, Inc. v. United States*, 5 Cl.Ct. 662, 728 (1984). Only delay on the critical path affects a project's completion date. *Id.*

As a preliminary matter, the court is constrained to note that Mega's post-trial briefing confounded, rather than clarified, the court's understanding of plaintiff's delay claims. Rather than integrate alleged Postal Service delays into a critical path analysis as required by *Shupe, Blinderman* and *Haney,* Mega simply listed instances of alleged Postal Service delays, and referred the court to the transcript of record, ostensibly to read detailed anecdotal testimony about the delays. Plaintiff provided summaries of government mismanagement alleged by Mr. Hearn in his daily logs, but failed to evaluate the significance of these allegations in light of the critical path. In fact, Mega failed to provide the court with any coherent analysis of critical path delays, presumably leaving to the court the task of disentangling critical and non-critical delay with the use of the as-planned and critical path charts. These unfathomable charts were of no value to the court in dissecting delay to the contract. The as-planned chart's cellophane overlays were undecipherable, and the critical path was impossible to discern. The related testimony was no clearer. Rather than present a theory of critical path delays in its briefs, plaintiff, to its detriment, simply paraphrased the testimony of its witnesses, and referred the court to Mega's ineffective charts. This was insufficient to sustain plaintiff's contention that defendant's actions delayed the completion of the project by 270 days. Plaintiff, by its expert witness, Mr. Patrick Cumine, attempted to prove that all but five days were attributable to the Postal Service. It is clear, however, that the facts do not warrant such a conclusion. Nonetheless, the record did confirm that Mega shared liability with the Postal Service for delay on the project.

In a letter to Mega dated December 20, 1985, Mr. Larry Reynolds, a Postal Service Construction Inspector assigned to the project, wrote, "I have found no one working at the ... project for the last 6 consecutive working days.... The gates are all locked so that even your sub-contractors

cannot access the site." On February 3, 1986, the Postal Service wrote to Mega, stating that, according to the project schedule, Mega was to have completed 35 percent of the project by the time it submitted its third request for progress payment. Yet, plaintiff's third request for progress payment showed that only 13 thirteen percent of the project had been completed. In the eyes of the court, this evidence served to discredit Mega's assertion that defendant was liable for 270 days of delay to the project.

Mega's shopping list of alleged delays was far too numerous and incoherent to examine in detail here. Nevertheless, the court was able to glean several incidents from plaintiff's claim that merit discussion.

From May through December, 1986, Mr. Hearn, Mega's on-site project superintendent, noted in his daily logs that the Postal Service would neither pay its architect to inspect the project on a regular basis, nor send its own construction inspector to the job site on a regular basis. As a result, Mega poured the dock leveler slab and laid a metal deck without an inspector present, in spite of Postal Service representations that an inspector would be present during both activities. While the court agreed that defendant's dereliction in maintaining an inspector on-site demonstrated Postal Service mismanagement of the project, plaintiff failed to demonstrate that such action was relevant to critical path delay.

In it's post-trial brief Mega also asserted that a design problem with the fire sprinkler system arose on December 20, 1985, and that defendant failed to solve the problem until June 19, 1986. Yet, in the Appendix filed with its post-trial brief, plaintiff referred to the fire sprinkler problem obliquely in an entry of May 1, 1986, and then in an entry of October 8, 1986, when the installation of the fire sprinklers began. The court has no idea when, or even if, Mega submitted alternative shop drawings to resolve the fire sprinkler design problem, or whether the delay from June 19, 1986, to October 8, 1986, was attributable

to defendant, plaintiff, or both. Nor did Mega state whether delay should be calculated before June 19, 1986, or after that date. Such disarray was typical of dozens of similarly incomprehensible delay claims for which plaintiff sought recovery.

The record does reveal that the job site was closed for seventeen days between August 8 and 25, 1986. The Postal Service was liable for this delay, alleged Mega, because it failed to provide crucial instructions to Mega on the fire sprinkler system, impact doors, and approximately thirty other items that required written directives from the Postal Service. Again, Mega failed to analyze this delay in light of its burden under *Haney* and *Shupe*. Consequently, the court cannot find defendant liable for the seventeen-day shutdown.

The longest single delay to the project, according to Mega, was the installation and finishing of drywall, which allegedly delayed completion of the project by 119 days. Plaintiff contended that the Postal Service was responsible for this delay because it failed to provide timely resolution of design defects in impact doors, fire sprinkler systems, heating and ventilation controls, electrical outlets, and screen walls, all of which required resolution before drywall activities could commence. As a result, asserted plaintiff, the installation and finishing of drywall was delayed from approximately October 30, 1986, until January 7, 1987.[4]

It is clear from the testimony of Mr. Irwin, defendant's delay expert, that the impact door design problem was solved sometime in September, 1986, and installation of the fire sprinklers was completed by November 14, 1986. Moreover, Mega's alleged hesitation to install even one side of the drywall while awaiting changes to the temperature control units was unfounded because only seven of these units had to be installed. In any event, Mr. Cumine, plaintiff's expert, testified on cross-examination that these units could have been installed even with one side of the drywall in place. Based on this evidence, the court finds that

---

**4.** From October 30, 1986, to January 7, 1987, is sixty-nine days. Plaintiff failed to explain how

it calculated 119 days of delay to drywall installation.

plaintiff caused delay to the project between November 14, 1986, the day on which the installation of the fire sprinklers was completed, and January 7, 1987, the day on which drywall activities commenced, a total of fifty-four days. Defendant, in turn, conceded liability for ninety days of delay to the project as a result of its own mismanagement. The poor quality of plaintiff's delay claim precluded the court from apportioning the remaining days of delay.

## CONCLUSIONS ON LIABILITY

After careful review of all the evidence of record, the court holds that the contracting officer properly terminated plaintiff for default for the reasons set forth above. The court also holds that defendant, based on its own concession alone, is liable for ninety days of delay to the project, and plaintiff is liable for fifty-four days of delay. As these proceedings are bifurcated, the court need not address the issue of damages here. The parties shall meet within three weeks of the date of filing of this Opinion to discuss damages in accordance with the findings of liability made by this court. If agreement, or agreement in principle, has not been achieved by July 15, 1992, the court will return the case to the active calendar to determine quantum. No costs.