Max M. STOECKERT, doing business as University Brick & Tile Co.

v.

The UNITED STATES.

No. 31–63.

United States Court of Claims.
March 15, 1968.

Ralph B. Potts, Seattle, Wash., attorney of record, for plaintiff.

James F. Merow, Washington, D. C., with whom was Asst. Atty. Gen. Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and LARAMORE, DURFEE, DAVIS, COLLINS, SKELTON, and NICHOLS, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

PER CURIAM:

This case was referred to Trial Commissioner Lloyd Fletcher with directions to make recommendation for conclusions of law on plaintiff's motion and defendant's cross-motion for summary judgment under Rule 54(b). The commissioner has done so in an opinion and report filed on July 21, 1967. Requests for review were filed by both parties and the case has been submitted to the court on oral argument of counsel and the briefs of the parties. Since the court agrees with the commissioner's opinion and report, with minor modifications, it

hereby adopts the same, as hereinafter set forth, as the basis for its judgment in this case. Therefore, plaintiff's motion for summary judgment is denied, defendant's cross-motion for summary judgment is granted, plaintiff's petition is dismissed and judgment is entered for defendant on its counterclaim in the sum of $5,764.54.

Commissioner Fletcher's opinion as modified by the court is as follows:

The plaintiff asks the court to review three decisions of the Corps of Engineers Board of Contract Appeals (CEBCA), all of which relate to the same Government contract. Each decision was adverse to plaintiff's contentions. The first decision was issued on November 30, 1961, and held that plaintiff's contract was properly terminated for default. The second decision was issued on April 27, 1963, and held that, in the completion of the contract work following plaintiff's default, the Government suffered excess costs amounting to $5,764.54, which excess costs were properly assessable against plaintiff.[1] The third decision was issued on August 19, 1965, and held that plaintiff's motion for rehearing on the ground of newly discovered evidence should be denied as untimely and for the further reason that the proffered "new" evidence was irrelevant to the issue of plaintiff's default.[2]

Under the provisions of the contract in dispute, the plaintiff was required to install a quarry tile floor and ceramic tile wainscoting in the powerhouse for the McNary Dam located on the Columbia River between Oregon and Washington. This tile work was covered in but one section of lengthy specifications developed primarily for the installation of the powerhouse equipment. Plaintiff made a successful bid for the tile work which was scheduled to follow the installation of the generators and other powerhouse equipment. He was awarded the tile work under a contract dated November 17, 1952.

Plaintiff had anticipated installing about one-fourth of the tile each year over a four-year period. He made his first visit to McNary in June 1953,[3] at which time Government representatives advised him that it would not be feasible to lay the tile until the generator installation was substantially completed. It was mutually agreed that he should wait until such completion before commencing the quarry tile work. In the spring of 1956, plaintiff was advised that the generator installation would soon be completed. He was requested to submit samples and a progress schedule for the Government's approval.

Thereupon, plaintiff hired a crew of experienced tile setters and placed them under the supervision of a foreman who had worked for him previously in Alaska. The quarry tile was to be placed on the floor of the main generator room of the powerhouse at elevation 287. The floor dimensions were 87 by 1,422 feet. The room was divided into an assembly bay, a station service bay, and the main expanse in which were placed 14 large generators. The floor was a concrete slab three feet thick designed to bear loads up to 1,000 pounds per square foot.

Plaintiff began work on the quarry tile floor by first laying a sample section on January 10, 1957. By this time, the concrete slab had been in place several years. Since the generators had been in operation, the powerhouse was

---

1. Plaintiff's appeal from the excess cost assessment was partially successful in that the CEBCA reduced the contracting officer's cost assessment of $8,245.45 to $5,764.54.

2. By order dated December 6, 1965, this court ruled that the third decision was not arbitrary, capricious, or unsupported by substantial evidence. Hence, it is treated herein as final and conclusive.

3. Plaintiff had not visited the damsite prior to bidding because he was under the mistaken impression that the powerhouse had not been constructed so that there was nothing for him to see. Actually, at that time, the powerhouse was under construction, and the concrete floor slab on which the quarry tile was to be laid had been poured.

heated and there was a low controlled humidity therein. As a consequence, the slab was very dry. Also it had been exposed during installation of the equipment in the powerhouse, and in places there were oil, grease, and paint stains on it as well as general grime. The specifications required the floor to have a wood float finish and that it be left rough enough to form a base for various floor finishes (such as the tiling to be laid by the plaintiff). The evidence discloses that the floor was, in fact, fairly smooth, especially in the areas where plaintiff commenced his work. These several factors combined to make successful placement of the quarry tile floor a very difficult operation.

Proper laying of the type of tile floor specified by this contract requires that a cement mixture (to which the tile may adhere) be first placed over the concrete slab. This mixture is commonly known as the "setting bed." The specifications here required that the setting bed be composed of "Class B mortar", the ingredients of which were defined as one cubic foot of portland cement, one cubic foot of hydrated lime or lime putty, not more than six cubic feet of damp loose aggregate, and sufficient water for workability. Plaintiff, however, did not use the specified mortar for the setting bed but, instead, used a Class A mortar mix of one part cement to three parts aggregate but without lime or lime putty.

Before plaintiff commenced work the Government had removed all loose dirt from the slab with a vacuum cleaner. In addition, before placing the setting bed, plaintiff's workmen swept the slab with a broom. They then wet the floor with a hose for 15 to 30 minutes, after which they sprinkled the floor with neat cement, placed the setting bed, and laid the tile thereon. In order to prevent exposure of the setting bed over a lunch hour or overnight, plaintiff's workmen covered with mortar only those portions of the floor which could be laid with tile

within one-half of a working day. Their procedure for filling the joints was to fill them with concrete mix which they wetted down using a hose with a fog nozzle.

Almost immediately following commencement of the quarry tile work, the Government inspector expressed his doubt that plaintiff's procedures would obtain a bond between the mortar setting bed and the concrete floor slab. However, he was assured by plaintiff's foreman that they would get plenty of bond. While bond between the concrete floor slab and the setting bed for tile is not specifically mentioned in the specifications, Government representatives and both plaintiff and his foreman thought that such a bond was a normal product of a workmanlike tile-laying process and was a requirement of this job.

Because of previous difficulties in securing a satisfactory quarry tile floor in the previously constructed Bonneville Dam Powerhouse, the Government employees at the site were aware of the special procedures and the care that would be necessary to obtain a satisfactory tile floor on this job. Plaintiff's foreman was told of these prior difficulties and suggestions were made as to how they should be overcome. It was especially emphasized that the slab must be thoroughly clean and wet. The record shows that plaintiff's foreman paid little, if any, attention to these suggestions.

In late January, engineers from the Walla Walla District office visited the McNary powerhouse to examine the tile work. During conferences on January 28 and 29, they advised the plaintiff's foreman, among other things, that the mortar bed was not being thoroughly mixed, that grout was not being properly placed in the joints, and that the placed tile floor was not being properly cured.[4] It was decided that the Government would furnish paper for covering the tile as an aid to its curing. On Febru-

4. Curing tile involves placing a moist material over the tile in order to retain the moisture content in the setting bed which aids the proper bonding of the tile.

ary 1, 1957, plaintiff personally visited the job. He changed the method of filling the joints and agreed to investigate joints already placed and, where faulty, to correct them.

On February 16, 1957, the Government inspector spent the day checking for loose tile in the completed areas. He did this by tapping the tile with a metal rod. When he heard a hollow sound, he considered that there was no bond underneath the tile and marked the area for further investigation. Following this inspection, the plaintiff was directed to take up samples at several places in the floor. This was done on February 19 and 20, and from these samples the Government representatives concluded that a satisfactory bond to the slab was not being obtained. This was attributed to the floor not being thoroughly wetted before the mortar was placed and the plaintiff was so advised. Nonetheless, floor tile was placed by plaintiff on the following day with no change in procedures.

On February 26, 1957, the contracting officer issued a stop order by telegram in which he advised plaintiff that the installed floor tile did not meet contract specifications, that it would have to be removed and replaced, and that a meeting should be held as soon as possible for the purpose of resolving the matter. A conference between the parties was held on March 5, 1957, and on the following day, plaintiff laid several test panels using various methods of mortar mix, wetting, curing, etc. According to the inspectors, plaintiff was now getting a good bond to the concrete slab but the tile was not bonding to the setting bed.

On March 18, 1957, a further conference was held at which representatives of the tile industry, cement suppliers, the Government and plaintiff were present. The test panels laid by plaintiff were examined by those present. Some thought they represented an acceptable job while others thought the tile was still not properly bonded to the setting bed. All agreed that a bond was achieved between the setting bed and the slab.

Further test samples were laid by plaintiff on March 19, 1957, during which the tile was "buttered" with cement grout before placement and then cured for ten days. The Government inspector's diary shows that in the case of at least one sample, a satisfactory bond was achieved both between the setting bed and the tile, and the setting bed and the concrete slab.

Meanwhile, the stop order remained in force. The plaintiff insisted that he be allowed to finish laying the entire floor before taking up the problem of replacing the defective tile already laid. At the same time, he claimed that he was unable to determine just what was required of him and that the Government should direct the method of placing the tile floor. The Government took the position that an acceptable performance was the plaintiff's responsibility and that he was required to produce a method for laying a satisfactory tile floor. Also, further tests had been made on the tile in place which showed a progressive deterioration. Parts of the floor which had sounded firm in prior tests now sounded hollow. While the first tests made had indicated one or two percent loose tile, or failure of bond to the concrete floor, these later tests showed a very substantial part was unbonded. On March 29, 1957, the contracting officer invoked General Provision 9 and wrote the plaintiff that the entire floor was unsatisfactory, directed its removal, and instructed him to begin over again, using proper and workmanlike procedures.

General Provision 9 of the contract provided, in pertinent part, as follows:

9. *Inspection.*—(a) Except as otherwise provided in subparagraph (d) hereof, all material and workmanship * * * shall be subject to inspection, examination, and test by representatives of the Contracting Officer at any and all times during manufacture and/or construction * * *. The Government shall have the right to reject defective material and workmanship or require its correction. Rejected workmanship shall be satisfactorily

corrected and rejected material shall be satisfactorily replaced with proper material without charge therefor, and the contractor shall promptly segregate and remove the rejected material from the premises. If the contractor fails to proceed at once with the replacement of rejected material and/or the correction of defective workmanship the Government may, by contract or otherwise, replace such material and/or correct such workmanship and charge the cost thereof to the contractor, or many terminate the right of the contractor to proceed as provided in Clause 5 of this contract, the contractor and surety being liable for any damage to the same extent as provided in said Clause 5 for terminations thereunder.

\* \* \* \* \* \*

(c) Should it be considered necessary or advisable by the Government at any time before final acceptance of the entire work to make an examination of work already completed, by removing or tearing out same, the contractor shall on request promptly furnish all necessary facilities, labor and material. If such work is found to be defective or nonconforming in any material respect, due to fault of the contractor or his subcontractors, he shall defray all the expenses of such examination and of satisfactory reconstruction. If, however, such work is found to meet the requirements of the contract, the actual direct cost of labor and material necessarily involved in the examination and replacement, plus 15 percent, shall be allowed the contractor and he shall, in addition, if completion of the work has been delayed thereby, be granted a suitable extension of time on account of the additional work involved.

Plaintiff refused to proceed with removal and replacement of the tile floor except at Government expense and by a method of installation to be specified by the Government. Upon his continued refusal to replace the floor, plaintiff's right to proceed was terminated for default on June 20, 1957, under General Provision 5 of the contract. The termination notice read, in pertinent part:

In view of the fact that you have not complied with the directive from this office dated 29 March 1957 to remove and replace under the provision of paragraph (a) of Clause 9, "Inspection," of said contract, the unsatisfactory quarry tile installed on the floor of McNary Dam powerhouse and that repeated efforts of this office have been of no avail in getting you to proceed in accordance with said directive even after you were advised by letter dated 16 May 1957 that failure to do so would result in termination of your right to proceed, you are hereby notified that, in accordance with Clause 5, "Delays—Damages," of said contract, your right to proceed further with the performance of said contract is hereby terminated.

You and/or your surety will be held liable for all excess costs incurred by the Government in removing and replacing this tile and completing all other items of the contract work. The Government reserves all rights and remedies provided by law or under the contract, in addition to charging for the excess costs.

The telegraphic notice constituted a decision and Findings of Fact pursuant to Clause 6, "Disputes" of said contract from which you have the right of appeal as specified therein.

Pursuant to the standard disputes clause in this contract, plaintiff appealed from the default termination. Meanwhile, his surety elected to take over the contract and, with the aid of another contractor, completed the work.

The removal of plaintiff's floor by the surety's contractor confirmed the inspector's belief that a satisfactory bond had not been obtained by plaintiff in that most of the floor (other than the test panels) came up in large sheets or sections, showing little or no bond between the setting bed and the floor.

The surety's contractor achieved a satisfactory bond by first scrubbing the slab with lye to remove oil, paint, and grime. Then he flooded the floor from one to three days to restore moisture.[5] Contrary to plaintiff's procedures, mortar was placed in an area small enough so that it could be covered with tile before it had taken an initial set. After the tile was placed, it was covered with a membrane and kept wet until the mortar cured. These procedures resulted in a tile floor acceptable to the Government.

Following completion of the contract by plaintiff's surety, the Government notified plaintiff that the excess costs incurred by the Government totaled $8,245.45, and findings of fact to this effect were issued by the contracting officer pursuant to the disputes procedures.

Following extensive hearings and briefings, the CEBCA issued its decision on November 30, 1961, in which it denied plaintiff's appeal from the termination of his right to proceed, but granted him a further hearing on the question of excess costs.

With respect to the default termination, the CEBCA found that the tile floor laid by plaintiff was so defective as to be unacceptable, because of a lack of a bond to the underlying concrete slab and the presence of defective joints. The Board further found that such bond was required under the trade practice admittedly accepted as controlling by all concerned during the contract performance period. Also, the Board found it was feasible to obtain a bond to the underlying concrete slab as proven by the fact that an acceptable bond was obtained by plaintiff in his own test panels and also by the surety's contractor when the contract work was completed. The Board found no excuse for plaintiff's refusal to continue performance and ruled that, even if the conditions could be considered "changes" (which the Board did not find to be the fact), this would not constitute a basis for a refusal to perform. The Board also ruled adversely on certain of plaintiff's contentions relative to purported interference with his performance, and finally concluded that:

> Therefore, on the facts before us we must conclude that the floor laid by appellant was not placed in the first class manner required by the specifications, and that the Contracting Officer was justified in ordering it replaced. Upon appellant's refusal to do so and his abandonment of the job, appellant's right to proceed with the work was properly terminated.

■■ At the outset, it must be observed that the termination of plaintiff's contract for default was proper if for no other reason than that he refused to follow the contracting officer's directive to remove and replace the tile floor. Instead, he elected to abandon the work and refused to proceed with removal and replacement of the floor except at Government expense and by a method of installation specified by the Government. However, such an election is simply not open to a Government contractor under the standard disputes clause found in this contract which specifically requires that:

> * * * Pending final decision of a dispute hereunder, the contractor shall proceed diligently with the performance of the contract and in accordance with the contracting officer's decision.

Thus plaintiff could not justifiably abandon the work simply because of his disagreement with the contracting officer. H & H Manufacturing Company, Inc. v. United States, 168 Ct.Cl. 873, 879 (1964).

---

5. Plaintiff contends that the Government prevented him from using this admittedly desirable procedure. The CEBCA found on the evidence before it that soon after the plaintiff commenced the quarry tile work, his workmen wetted the floor with a hose, and as a result water ran through the contraction joints down to the room below. The Government ordered them to prevent the recurrence of such incident. The replacment contractor overcame this problem by caulking the contraction joints and building little dams with sand to contain the water.

Cf. Wingate Construction Company v. United States, 164 Ct.Cl. 131 (1964) where, after protesting a direction by the contracting officer, the contractor nevertheless continued with its work under the contract.

The contractual procedures required of a Government contractor under circumstances such as are involved here have been clearly explained by the Armed Services Board of Contract Appeals in Appeal of Wiggins, 58–1 BCA ¶ 1644 (1958). There, the ASBCA observed at p. 6102:

> Having, however, received the list of deficiencies with instructions to correct them, the contractor under the "Inspection" and "Changes" articles of the contract was required to comply. To the extent that such list of deficiencies constituted a change in specifications or performance of work not required by the contract, the contractor would have been entitled to an equitable adjustment in the amount due and/or in the time required for performance provided he had complied with the procedural requirements of the contract. The contractor, however, elected not to follow this course.
>
> On 12 July 1957 the contractor clearly abandoned further work on this contract. Upon proper notice and because of the abandonment and the failure to make satisfactory progress, the contracting officer terminated the contract for default. Under the circumstances, he could do no less. * * *

This plaintiff refused to proceed in the face of the contracting officer's order issued pursuant to a contract provision (Clause 9, quoted above) which provided for full compensation to him if the work, upon removal, was found to meet the requirements of the contract. Such refusal alone justified the termination and is sufficient to require dismissal of plaintiff's petition.

■ However, the CEBCA and the parties have addressed themselves at length to the merits of plaintiff's contentions that there was no contractual requirement for a bond between the setting bed and the slab, that even if there were such requirement it would be impossible of performance under the conditions existing at the site, and that the Government inspectors interfered with plaintiff's work to such a degree as to indicate bad faith and a deliberate effort to ruin the plaintiff. After a careful evaluation of the evidence before it, the CEBCA made findings of fact adverse to each of plaintiff's contentions. Those findings are all supported by substantial evidence and hence, they must be accorded finality under the provisions of the Wunderlich Act, 41 U.S.C. §§ 321–322.

The record before the CEBCA is replete with testimony and exhibits from which the Board was justified in concluding that plaintiff's floor was not laid in the "first class manner" required by the specifications. Several witnesses testified to their observation of poor workmanship, including such objectionable practices as improper and incomplete mixing of mortar, the spreading of mortar over such large areas that it would tend to set before the tile could be laid, careless handspreading of neat cement, improper placement of grout in the joints, and failure to restore the moisture content of the dry slab by soaking it with water. Photographs of plaintiff's floor taken as it was being removed by the replacement contractor clearly show many large areas of tiling and setting bed coming off the concrete slab in very sizable chunks. That this condition proved a lack of bond between the setting bed and the slab was clearly established by the witnesses before the CEBCA.

But, says plaintiff, such a bond is not specifically mentioned in the specifications and, therefore, it is not a requirement of the contract. The CEBCA's persuasive answer to this argument was as follows:

> * * * During the entire time of performance appellant, his foreman, and all of the Government's representatives were of the opinion that a

bond was required. In fact, both appellant and his foreman testified to that effect at the hearing before this Board. The interpretation of a contract by the parties to it before it becomes the subject of controversy is deemed to be of great, if not controlling weight. Houston Ready-Cut House Co. v. United States, 96 F.Supp. 629, 635, 119 C.Cls. 120; Central Engineering & Construction Company v. United States, 103 C.Cls. 440, 465, 59 F.Supp. 553. We are persuaded that a bond was required between the setting bed and the concrete floor.

■ In addition, the Board had before it considerable evidence that the attainment of such a bond was an acknowledged trade practice or custom. Therefore, the contract must be read as including the bond requirement. Gholson, Byars, & Holmes Construction Co. v. United States, 351 F.2d 987, 173 Ct. Cl. 374 (1965).

The only evidence which plaintiff cites as contrary to the existence of a bond requirement is the opinion of his expert witness. The court has recently disposed of this type of argument in Phillips Construction Co., Inc. v. United States, 179 Ct.Cl. 883 (1967), where it is stated on p. 890:

It is true that the record contains evidence to the contrary from some of plaintiff's witnesses. But plaintiff goes much too far in asking, in effect, that this court make an independent evaluation of this conflicting evidence and reverse the Board on the ground that it should have believed one group of witnesses rather than another.

■ Thus, it is clear that in its review of an administrative record the court does not weigh the evidence independently, but merely examines it to see if there is substantial evidence in the entire record to sustain the administrative findings. Confederated Tribes of Warm Springs Reservation of Oregon v. United States, 177 Ct.Cl. 184 (1966). In the present case, it is undeniable that the CEBCA's resolution of the conflict in testimony was amply supported by substantial evidence.

Plaintiff argues further that if a bond between the setting bed and the slab was a requirement of the contract, then it was impossible of performance due to the different coefficients of expansion in a large, dense concrete slab and in a mortar setting bed. This argument, however, fails to make the critical distinction between impossibility of performance (which may excuse the contractor from performance) and the encountering of unanticipated difficulties (which does not excuse the contractor from performance).[6]

From the record in this case, it is quite clear that the age and dryness of the floor slab made it difficult to achieve a satisfactory bond thereto. That it was by no means impossible, however, is demonstrated by the CEBCA's well supported findings that plaintiff achieved a satisfactory bond with his test panels, as did the surety's contractor with his replacement floor. It is true, as plaintiff argues, that some hollow sounding areas subsequently developed even in the tile floor laid by the replacement contractor. However, those areas were nowhere near the magnitude of those evidenced in plaintiff's floor, and the Government's representatives remained of the view that the replacement floor was satisfactory even though not perfect throughout. This evidence was sufficient to refute plaintiff's claim of impossibility of performance.

Plaintiff next asserts that the Government representatives at the site prevented his employees from using procedures which would have aided in obtaining a bond between the setting bed and the slab. For example, he says

---

6. In United States v. Spearin, 248 U.S. 132, 136, 39 S.Ct. 59, 61, 63 L.Ed. 166 (1918), the Supreme Court pointed out that, "where one agrees to do, for a fixed sum, a thing possible to be performed, he will not be excused or become entitled to additional compensation, because unforeseen difficulties are encountered."

that his foreman was prevented from bush-hammering [7] the slab and was ordered to stop flooding water over the slab. There is no evidence to support these allegations. Plaintiff never contemplated doing any bush-hammering nor did he request permission to do so. With respect to his claim that he was not permitted to flood water on the concrete slab to restore its moisture content, the Board found on substantial evidence before it that the Government did not require a reduction in the amount of water being used. Rather, the order was that the water not be allowed to run through the contraction joints into the room below. This was a reasonable requirement which the replacement contractor easily met by sealing the joints and erecting sand dams to hold the water.

■ Other allegations by plaintiff of interference with the work are equally unfounded. In particular, there is no basis for plaintiff's many assertions of bad faith, prejudice, and personal malice on the part of Government representatives. Such serious allegations must be founded on clear and convincing proof. See Nichols & Company v. United States, 156 Ct.Cl. 358 (1962), cert. denied, 371 U.S. 911, 83 S.Ct. 255, 9 L.Ed.2d 170. Here, by contrast, there is no evidence at all to support plaintiff's allegations.

■ With respect to excess costs claimed by the Government in completing the contract, it has been mentioned above that, in a separate proceeding, the CEBCA found the Government to have incurred excess costs as a result of plaintiff's default in the total amount of $5,764.54. The defendant has counterclaimed here for that amount plus six percent interest from the date of the contracting officer's initial findings, i. e., December 15, 1958. Perhaps because he recognizes that the CEBCA's decision on excess costs was fully supported by the evidence before it, plaintiff has assigned no error with respect thereto. Accord-

ingly, the decision must be accorded finality here. United Contractors v. United States, 368 F.2d 585, 177 Ct.Cl. 151 (1966).

■ Finally, consideration must be given to the defendant's contention that, under its counterclaim, it is entitled to interest on the excess cost assessment allowed by the CEBCA. The defendant admits that the award of interest is discretionary and, in the exercise of discretion, the court declines to make such an award in this case. We take into account the plaintiff's apparent financial condition, the long time it has taken to bring this case to final judgment, the plaintiff's good faith though he acted erroneously, and the fact that contractors prevailing over the Government do not normally collect interest on their awards.

Therefore, plaintiff's petition is dismissed and judgment is entered for defendant on its counterclaim in the amount of $5,764.54.

---

7. This is an engineering term used to describe the operation of roughening a hard surface with a special hammer having rows of projecting points on its striking face. See Chambers, Technical Dictionary, 3d Ed. Rev.