**BECHO, INC., Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 98–798C.**

United States Court of Federal Claims.

Sept. 1, 2000.

---

Herschel Bullen, Salt Lake City, Utah, for plaintiff.

Jan Marie Folena, U.S. Department of Justice, Washington, D.C., with whom was Assistant Attorney General David W. Ogden, for the defendant.

## OPINION

ALLEGRA, Judge.

In this contract case, the Army Corps of Engineers (the Corps) terminated, for default, its contract with plaintiff, Becho, Inc. (Becho), based on Becho's failure to perform a modification ordered by the Corps' contracting officer. Becho claims that the modification constituted a cardinal change, excusing it from further performance, and requiring that the default termination be set aside. Defendant has filed a motion for partial summary judgment, seeking a ruling that, as a matter of law, sustains the termination for default. Because the court finds that material questions of fact exist as to whether the modification was a cardinal change, it must deny the defendant's motion.

### I. Facts

On January 31, 1997, the Corps awarded Contract No. DACW6897–0012 to Becho. Line item 0001 of the contract was for the supply and delivery of 5,000 cubic yards of riprap—angular stone produced from bedrock that is used, *inter alia*, to control ero-

sion. On May 19, 1997, the Corps exercised line item 0002 of the contract, an option for an additional 2,500 cubic yards of riprap. The contract provided various gradation requirements for the riprap—none of the rocks were to weigh less than 75 pounds or more than 2,500 pounds, and the average weight was to be 500 pounds. The riprap was to be stockpiled within an area designated by the Corps at its Walton Quarry in Jackson Hole, Wyoming, with the exact location and limits of the stockpile area to be determined by the Contracting Officer's Representative (COR). The riprap was to be stockpiled in a manner that would not cause segregation, *i.e.*, like-sized pieces grouped together, or excessive breakage. The contract further provided that riprap would be measured for payment as the number of cubic yards of satisfactory material in place in the stockpile. Payment was to be at a contract unit price per cubic yard.

The contract incorporated, by reference, a number of standard FAR clauses. Among these was the standard "disputes clause," which is set forth at 48 C.F.R. § 52.233–1, and provides as follows:

Disputes

(a) This contract is subject to the Contracts Disputes Act of 1978 as amended (41 U.S.C. §§ 601–613).

. . . . .

(i) The contractor shall proceed diligently with the performance of this contract, pending final resolution of any request for relief, claim, appeal, or action arising under the contract, and comply with any decision of the Contracting Officer.

In addition, the contract incorporated, by reference, standard inspection and changes clauses. The inspection clause authorizes the government to inspect and accept delivered items, and indicates that "[a]cceptance shall be conclusive, except for latent defects, fraud, gross mistakes amounting to fraud, or as otherwise provided in the contract." 48 U.S.C. § 52.246–15(k). In relevant part, the changes clause provides that the contracting officer "may at any time, by written order, . . . . make changes within the general scope of this contract," and provides that any dis-

pute over whether such a change requires an equitable adjustment in the contract price "shall be a dispute under the Disputes clause." 48 C.F.R. § 52.243–1.

On January 31, 1997, Fernando Aguilar, a civil engineer with the Walla Walla District of the Corps, was designated COR on the subject contract. On or about April 23, 1997, Becho commenced delivery of the 5,000 cubic yards of riprap, stacking the material into a pile in the south part of the quarry (pile 1). Defendant alleges that the Corps, almost immediately, noticed that not all the material supplied met the size specifications of the contract; plaintiff, however, alleges that such concerns were not communicated to it until much later. On May 19, 1997, Becho presented an invoice to the Corps in the amount of $197,000 for the payment of 5,000 cubic yards of riprap material. On July 2, 1997, following approval by Mr. Aguilar, the Corps issued Becho a certificate of payment, but for only 4,322 cubic yards of riprap material, which defendant alleges was the amount of conforming riprap contained in pile 1. Plaintiff, instead, contends that pile 1 reached an ultimate volume of 5,534 cubic yards of conforming riprap.

During late May and into June of 1997, as Becho continued to deliver and stack the 2,500 cubic yards of riprap for line item 0002 into a second pile (pile 2), various disputes arose between the parties as to whether portions of the riprap conformed with the contract specifications. These disputes continued even after Becho allegedly completed the delivery of this second batch of riprap on or about June 20, 1997. The parties disagree regarding the nature of these disputes, the degree of good (or bad) faith exercised or exhibited by the parties in taking their respective positions, and the content and character of the many oral conversations that occurred during this period. On June 10, 1997, Becho sent the Corps a letter requesting a one-week extension on the contract delivery schedule, citing, as one reason, inclement weather. By Modification P00002, dated June 16, 1997, the contract was modified to extend delivery dates for line items 0001 and 0002 to May 30, 1997, and June 20, 1997, respectively. This modification also in-

dicated that the Corps would not be exercising an additional option in the contract, line item 0003, for more riprap.

On July 8 and 9, 1997, the Corps excavated portions of piles 1 and 2 to examine the size of the rocks therein, after which the Corps adhered to its position that some of the riprap was undersized. Becho was unrepresented at the site during this excavation process. On July 18, 1997, Becho sent a letter to the Corps asking it to reconsider its decision not to exercise the line item 0003 option. This letter included various photographs, based upon which Becho contended that the riprap delivered was "not only what was requested as a minimum by Mr. Aguilar but in fact was much over the medium requested." After various communications in which the parties continued to disagree regarding whether the riprap met the contract specifications, on August 6, 1997, a meeting was held between representatives of Becho and the Corps seeking to resolve this matter. Following this meeting, on August 7, 1997, the Corps sent Becho a letter requesting that it furnish a plan for correcting the alleged nonconformity of the delivered materials. This letter also indicated that a Corps representative would be present at all times while the contractor was sorting the materials. That same day, Becho sent the Corps a letter in which it disagreed that there were problems, but, nonetheless, indicated that it would resort pile 2 beginning on or about August 11, 1997.

Sometime after the August 6, 1997, meeting (most likely on August 11, 1997), Becho began resorting the riprap in pile 2, also reincorporating therein the materials that had been dissociated in the excavation by the Corps. Becho alleges that it performed this task not but because it agreed with the Corps' position, but rather to expedite its payment for pile 2. In a letter dated September 3, 1997, Becho vociferously complained about the Corps' supervision of the resorting of pile 2 and, in particular, the conduct of the Corps' representatives. Sometime around September 10, 1997, the Corps mailed Becho Modification P00003, a proposed bilateral modification to the original contract that would have required plaintiff to correct piles 1 and 2. It was received by plaintiff in mid-September of 1997, but was never executed because Becho objected to its terms. In a letter dated September 19, 1997, Becho notified the Corps that it would be filing a claim seeking additional costs, citing, among other reasons, the "additional work performed due to interference and delay by the contracting COR." On September 23, 1997, the Corps issued Modification P00004, which directed Becho to remove all nonconforming material from piles 1 and 2 and transport that material out of the quarry. In addition, the modification required Becho to provide conforming material, in a separate pile, until all of the conforming material totaled 7,500 cubic yards, as required by line items 1 and 2 in the original contract.[1] The modification indicated that there would be no change in the contract price, *i.e.*, Becho would not be compensated for these services.

In various communications, Becho objected to Modification P00004, arguing, *inter alia*, that it had completed its work on pile 1, that that pile had been accepted and payment made therefor, and that it would not perform any additional work without additional compensation. While on approximately September 18, 1997, Becho had completed the sorting of nonconforming materials from pile 2, it never commenced the resorting of pile 1. On or about September 29, 1997, Becho removed its equipment from the Walton Quarry, without removing any nonconforming material from pile 1 or removing the remaining nonconforming material it had separated from pile 2. On September 30, 1997, Becho sent the Corps a letter demanding payment for pile 2 and summarizing its objections to Modification P00004, noting, in particular, that the modification "fails to provide for the restockpiling costs." On October 28, 1997, the

---

1. In pertinent part, the modification provided: Contractor will complete sorting of the two piles presently in the Walton Quarry. Upon completion of sorting process Contractor will remove non-conforming sorted material. Contractor will not remove any non-sorted materials unless permission by Contracting Officer's Representative is obtained. Contractor may bring in conforming material and place in separate pile, until total of conforming material for this contract totals 7500 CY.

Corps informed Becho that it was in anticipatory breach of the contract, due to its failure to provide a proposed plan for completing the work required by Modification P00004. Becho responded by letter dated October 30, 1997, that it believed it had delivered sufficient material which conformed to the specifications of the contract. On October 31, 1997, the Corps terminated the contract for default.

On April 21, 1998, plaintiff submitted a claim to the Corps' contracting officer for monies owed on the contract in the amount of $464,162.95. Plaintiff filed suit in this court on October 19, 1998, arguing that the termination for default should be invalidated. Specifically, the complaint alleges, *inter alia*, that Modification P00004 amounted to a cardinal change to the contract. Plaintiff argued that this cardinal change, together with bad faith exhibited by the Corps in administering the contract, amounted to a material breach of the contract, excusing Becho from further performance. On December 2, 1998, the Corps issued its final decision denying plaintiff's claim and assessing damages against plaintiff for breach of contract, nonperformance, and unjust enrichment, in the amount of $61,789.37. On January 11, 1999, plaintiff filed an amended complaint, alleging breach of contract, unjust enrichment, and requesting that the court invalidate an unfavorable performance evaluation, the termination for default and the decision assessing damages against plaintiff. On February 1, 1999, defendant filed a counterclaim for $1,141.87 for costs incurred by the Corps in procuring additional riprap material due to Becho's alleged delivery of nonconforming materials.[2] On October 19, 1999, defendant filed a motion for partial summary judgment. On August 22, 2000, oral argument was conducted on this motion.

## II. Discussion

The central issue raised by the defendant's partial summary judgment motion is whether the termination for default here was lawful. In response to the motion, plaintiff argues that material questions of fact exist that preclude the grant of partial summary judgment.

### A. Legal Background

Summary judgment is appropriate when there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. RCFC 56; *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–48, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). Disputes over facts that are not outcome-determinative under the governing law will not preclude the entry of summary judgment. *Anderson*, 477 U.S. at 248, 106 S.Ct. 2505. However, summary judgment will not be granted if "the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable [trier of fact] could return a verdict for the nonmoving party." *Id.* See also *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *California ex rel. Dept. of Transp. v. United States*, 27 Fed.Cl. 130, 135 (1992), *aff'd*, 11 F.3d 1071, 1993 WL 410284 (Fed.Cir.1993). When reaching a summary judgment determination, a judge's function is not to weigh the evidence, but to determine whether there is a genuine issue for trial. *Anderson*, 477 U.S. at 249, 106 S.Ct. 2505. See also *Agosto v. INS*, 436 U.S. 748, 756, 98 S.Ct. 2081, 56 L.Ed.2d 677 (1978) ("[A] [trial] court generally cannot grant summary judgment based on its assessment of the credibility of the evidence presented"). The judge must determine whether the evidence presents a disagreement sufficient to require submission to fact finding, or whether it is so one-sided that one party must prevail as a matter of law. *Anderson*, 477 U.S. at 250–52, 106 S.Ct. 2505. In doing this, all facts must be construed in a light most favorable to the nonmoving party and all inferences drawn from the evidence must be viewed in the light most favorable to the party opposing the motion. *Matsushita*, 475 U.S. at 587, 106 S.Ct. 1348 (citing *United States v. Diebold*, 369 U.S. 654, 655, 82 S.Ct. 993, 8 L.Ed.2d 176 (1962)).

---

2. Defendant claims that plaintiff owes $65,749.01 for reprocurement costs and that defendant owes plaintiff $64,607.20 for supplied conforming rock. The difference is $1,141.87, representing, according to defendant, excess reprocurement costs owed by plaintiff.

■ The Supreme Court has instructed that in determining whether summary judgment is appropriate, the trial court "must view the evidence presented through the prism of the substantive evidentiary burden" applicable to the particular cause of action before it. *Anderson*, 477 U.S. at 254, 106 S.Ct. 2505. Turning to this matter, it is well-settled that a "default-termination is a drastic sanction . . ., which should be imposed (or sustained) only for good grounds and on solid evidence." *J.D. Hedin Constr. Co. v. United States*, 187 Ct.Cl. 45, 408 F.2d 424, 431 (1969) (internal citation omitted). *See also CJP Contractors, Inc. v. United States*, 45 Fed.Cl. 343, 371 (1999). The initial burden in a termination for default case is on the government to establish that the contractor was in default. *See Lisbon Contractors, Inc. v. United States*, 828 F.2d 759, 765 (Fed.Cir. 1987); *Florida Engineered Constr. Prods. Corp. v. United States*, 41 Fed.Cl. 534, 538 (1998). If default is established, then the burden shifts to the contractor to show that its failure to perform was excusable. *CJP Contractors*, 45 Fed.Cl. at 371; *Florida Engineered*, 41 Fed.Cl. at 538–39. A contracting officer's decision to terminate a contract for default will be set aside if it is "arbitrary and capricious," or "represents an abuse of his discretion." *Darwin Construction Co. v. United States*, 811 F.2d 593, 598 (Fed.Cir. 1987).

## B. Was the termination for default here appropriate, as a matter of law?

Initially, defendant argues that Becho's failure to complete the work required by Modification P00004 constituted a material breach and anticipatory repudiation of the contract, making the termination for default appropriate. Defendant correctly asserts that if the additional work requested by Modification P00004 was covered by the inspection and changes clauses of the contract, then the disputes clause of the contract required Becho to perform this work, whether or not it agreed with the modification, and later seek an equitable adjustment, if appropriate. *See Valley View Enterprises, Inc. v. United States*, 35 Fed.Cl. 378, 383 (1996) ("The proper course for the contractor, if it believes it is being asked to do work beyond that called for by the contract, is to file a claim for an equitable adjustment, typically under the Changes clause, with the contracting officer."). *See also Alliant Techsystems, Inc. v. United States*, 178 F.3d 1260, 1275–76 (Fed.Cir.1999); *Stoeckert v. United States*, 183 Ct.Cl. 152, 391 F.2d 639, 645 (1968). As such, according to defendant, Becho's failure to perform Modification P00004, in the face of a duty to proceed, constituted both a material breach and, ultimately, an anticipatory repudiation of the contract, thereby warranting the termination for default. *See Cascade Pacific International v. United States*, 773 F.2d 287, 292 (Fed.Cir.1985); *Composite Laminates v. United States*, 27 Fed.Cl. 310, 323 (1992).

■ In response, plaintiff argues (and defendant admits) that if Modification P00004 and the conduct leading thereto constituted a so-called "cardinal change," Becho was not obliged to perform the modification and its failure to do so would not provide a basis for the default termination. Describing the cardinal change concept, the Federal Circuit in *Alliant Techsystems* observed:

> Of course, the government may not, through a contracting officer's decision, impose obligations on a contractor far exceeding any contemplated by their contract. If the government orders a 'drastic modification' in the performance required by the contract, the order is considered a 'cardinal change' that constitutes a material breach of the contract.

*Alliant Techsystems*, 178 F.3d at 1276 (quoting *Air–A–Plane Corp. v. United States*, 187 Ct.Cl. 269, 408 F.2d 1030, 1033 (1969)). Numerous cases hold that "[s]uch a material breach has the effect of freeing the contractor of its obligations under the contract, including its obligations under the disputes clause." *Alliant Techsystems*, 178 F.3d at 1276. *See also Emily Malone d/b/a Precision Cabinet Co. v. United States*, 849 F.2d 1441, 1445–46 (Fed.Cir.1988) (no default termination where preceded by cardinal change); *General Dynamics Corp. v. United States*, 218 Ct.Cl. 40, 585 F.2d 457, 462 (1978). Because a cardinal change funda-

mentally alters the contractual undertaking of the contractor, it is not comprehended or redressable by the standard FAR clauses, which are designed to convert traditional breaches of contract into changes for which equitable adjustments could be pursued. *See Allied Materials & Equipment Co., Inc. v. United States,* 215 Ct.Cl. 406, 569 F.2d 562, 563–64 (1978) (per curiam); *Edward R. Marden Corp. v. United States,* 194 Ct.Cl. 799, 442 F.2d 364, 369 (1971).

■ Whether a change is cardinal is principally a question of fact, requiring that each case be analyzed individually in light of the totality of the circumstances. *See Allied Materials & Equip. Co., Inc. v. United States,* 569 F.2d at 565; *Wunderlich Contracting Co. v. United States,* 173 Ct.Cl. 180, 351 F.2d 956, 966 (1965); *Saddler v. United States,* 152 Ct.Cl. 557, 287 F.2d 411, 413 (1961); *Green Management Corp. v. United States,* 42 Fed.Cl. 411, 430 (1998). "Each case must be analyzed on its own facts and in light of its own circumstances, giving just consideration to the magnitude and quality of the changes ordered and their cumulative effect upon the project as a whole." *Wunderlich Contracting,* 351 F.2d at 966 (citing *Saddler v. United States,* 152 Ct.Cl. 557, 561, 287 F.2d 411 (1961)). *See also Amertex Enterprises, Ltd. v. United States,* No. 90–684C, 1995 WL 925961, at *59–61 (Fed.Cl. Dec.15, 1995), aff'd, 108 F.3d 1392, 1997 WL 73789 (Fed.Cir.1997), cert. denied, 522 U.S. 1075, 118 S.Ct. 851, 139 L.Ed.2d 752 (1998). Further, "[a] determination of the scope and nature of alleged changes requires a fact-intensive inquiry into the events that led to the excess work and their effect on the parties. The court must investigate the contract as a whole to determine whether the government is responsible for the contractor's difficulties." *Thermocor, Inc. v. United States,* 35 Fed.Cl. 480, 490 (1996) (citing *Universal Contracting & Brick Pointing Co. v. United States,* 19 Cl.Ct. 785, 792–93 (1990)).[3] Of

course, if fact questions exist as to whether the modification in question was a cardinal change, partial summary judgment would not lie.

■ Defendant, however, argues that Modification P00004 indisputably did not constitute a cardinal change, but rather was a "corrective" change subject to the disputes clause in the contract. This argument comprises more cry than wool. Merely placing the "corrective" label on this modification obviously is not controlling, as the determination whether a change is cardinal plainly is more than "a mere exercise in semantics." *Mann Construction Co.,* 81–1 BCA 15,087, 1981 WL 6995 at *19 (Ag.B.C.A.1981). Indeed, while there is no precise calculus for determining whether a cardinal change has occurred, the courts have considered, *inter alia,* the following factors: (i) whether there is a significant change in the magnitude of work to be performed; (ii) whether the change is designed to procure a totally different item or drastically alter the quality, character, nature or type of work contemplated by the original contract; and (iii) whether the cost of the work ordered greatly exceeds the original contract cost. *See Alliant,* 178 F.3d at 1276; *Paragon Energy Corp. v. United States,* 229 Ct.Cl. 524, 527–28, 1981 WL 22045 (1981); *Edward R. Marden Corp.,* 442 F.2d at 369–70; *Thermocor, Inc.,* 35 Fed.Cl. at 490.[4] As should be evident, these subsidiary questions themselves are intensely factual, almost inevitably obliging this court to receive and weigh evidence—a task that is obviously inappropriate at this juncture of the proceedings.

■ To escape the force of this conclusion, defendant asserts that the affidavits and other evidence supplied by plaintiff fail to create genuine issues of material fact. Plaintiff has supplied two affidavits, with accompanying exhibits, that make various factual assertions regarding the administration of the original

---

3. *See also Stone Forest Industries, Inc. v. United States,* 973 F.2d 1548, 1550–51 (Fed.Cir.1992) ("The determination depends on the nature and effect of the violation in light of how the particular contract was viewed, bargained for, entered into, and performed by the parties.").

4. *See also Saddler v. United States,* 152 Ct.Cl. 557, 287 F.2d 411, 413–15 (1961); *General Contracting & Construction Co., Inc. v. United States,* 84 Ct.Cl. 570, 579, 1937 WL 3292 (1937). *Cf. Magoba Construction Co. v. United States,* 99 Ct.Cl. 662, 689–90, 1943 WL 4283 (1943) (sheer

contract, the conduct of the COR, and the nature of the work and cost associated with complying with Modification P00004. However, relying on *Applied Companies v. United States*, 144 F.3d 1470, 1475 (Fed.Cir.1998), defendant asserts that these affidavits fall short of creating genuine issues of material fact because they are contradicted by documentary evidence that supports the Government's contention and are not corroborated by contemporaneous documentation of the events alleged.

*Applied* was a case involving a government setoff, in which the Federal Circuit was confronted with an affidavit from a company official which stated that, prior to the time that the government had sought to exercise its setoff, the company had already credited that amount against the government's debt on an unrelated contract. This affidavit was contradicted by a series of letters, all dated after the crediting allegedly occurred, which stated that the contractor "intended" or "proposed" to credit the overpayment against the government's debt and thus suggested that the crediting had not yet occurred. Moreover, the affidavit was not supported by any accounting records indicating that the crediting of the overpayment had actually occurred and was inconsistent with court records indicating that, at the time the contractor allegedly was crediting the government's account, it was still contesting whether it had received

any overpayment in an action before the Board of Contract Appeals.[5]

Finding that the affidavit was "irreconcilable" and "entirely inconsistent" with the documentary evidence, the Federal Circuit upheld this court's ruling that the affidavit did not create a question of fact, stating "[i]n light of the strong documentary evidence supporting the government's contention that Applied never set off the overpayment debt against any particular contract obligation and the absence of evidentiary support for Applied's argument, [the] affidavit alone is insufficient to create a genuine issue of material fact." *Applied,* 144 F.3d at 1474–75. As further support for this ruling, the court recited the "well settled" principle that " 'a conclusory statement on the ultimate issue does not create a genuine issue of fact.' " *Id.* (quoting *Imperial Tobacco Ltd. v. Philip Morris, Inc.,* 899 F.2d 1575, 1581 (Fed.Cir. 1990)).[6]

The situation here is starkly different than in *Applied.* First, the affidavits here do not consist of gauzy generalities, but rather provide extensive detail regarding the alleged unreasonable and abusive actions of the COR and the costs and other impacts that would have been associated with performing Modification P00004.[7] Unlike the affidavit in *Applied,* these affidavits thus do not contain merely "a conclusory statement on the ultimate issue." Second, the assertions in these affidavits are not contradicted to any real

number of changes is not, in and of itself, the test for determining cardinal change).

**5.** Some of these facts are taken from this court's opinion in *Applied. Applied Companies v. United States,* 37 Fed.Cl. 749, 760 (1997), aff'd, 144 F.3d 1470 (Fed.Cir.1998).

**6.** This proposition, indeed, has an impressive pedigree. *See also Lujan v. National Wildlife Federation,* 497 U.S. 871, 889, 110 S.Ct. 3177, 111 L.Ed.2d 695 (1990); Edward Brunet, "Summary Judgment Materials," 147 F.R.D. 647, 661 & n. 84 (1993) (citing additional cases); William W. Schwarzer, Alan Hirsch & David J. Barrans, "The Analysis and Decision of Summary Judgment Motions," 139 F.R.D. 441, 478 & n. 210 (1991) (citing additional cases); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice and Procedure § 2738 n. 33 (1998) (citing numerous cases).

**7.** One of these affidavits, signed by Louis C. Lucido, the President and CEO of Becho, is 24

pages long and details Becho's allegations regarding the conditions under which the rock originally delivered to the quarry was stacked, the way the stockpiles were subsequently treated by the Corps, disagreements regarding the amount of conforming stone that had been delivered, problems with the supervision of the resorting of stockpile 2, and the circumstances that led Becho to reject Modification P00004. This affidavit further cites specific instances of alleged bias by the COR and flags a potential reason for this bias, *i.e.,* a prior dispute between Becho and this same representative. The other affidavit, signed by Randy Thomas, the manager of Becho's Fox Creek Quarry, is 31 pages long and provides extensive and specific factual assertions with respect to the site conditions and contract performance, the prejudice of the COR, bias in the Corps' measurement of the amount of conforming rock that had been delivered, and facts concerning the disturbing and resorting of various of the stockpiles. Attached to this affidavit are four exhibits and 29 photographs purportedly illustrating various of the assertions made in the affidavit.

degree by the documentary evidence in the record, let alone being "irreconcilable" or "entirely consistent" therewith, as was the case in *Applied.* Certainly, nothing in the record expressly states that Becho's representatives thought Mr. Aguilar was acting reasonably in administering the contract [8] or that Modification P00004, at least insofar as it required the resorting of pile 1, was anything other than a drastic, costly and unnecessary change.[9]

Defendant thus is left to rest its argument on the splintering reed that the affidavits are ineffective solely because they contain factual assertions that were not previously recorded in the documents that have been produced so far in this litigation. But, this claim is likewise meritless. To begin with, there are indications in the documents in the record that Becho was seriously dissatisfied with the administration of the contract well before Modification P00004 was issued, as well as documents containing clear and contemporaneous objections to the modification itself.[10] Even were this not true, the holding in *Applied* is not so pliable as to be stretched to

---

8. Defendant asserts that Becho's claim that the COR was disruptive is contradicted by its prior demand that the COR be present during the resorting process. Plaintiff, however, explains that this demand was more a condemnation than an endorsement of the COR's prior conduct, based on its fear that he would prove even more problematic were he not present. This contention is supported by a September 18, 1997, letter to the Corps, in which Becho stated: "Please have your contracting representative present at all times during the operation at the Walton Quarry so we do not have any more delays or miscommunications that create another problem that existed in the past without having visual inspection by the contracting representative." Other documents in the record indicate that Becho had previously complained about the contract supervision. For example, in a September 3, 1997, letter to the Corps, Becho stated that "it should be known that the lack of communication of [the noncompliance with the contract specifications] rests fully with the Corps of Engineers failure to properly follow contract notification procedures, and to properly supervise this project." This letter also attributes the problems experienced in dealing with the contract to "quite simply the negligence and interference of the Governments [sic] officers and employees by their misinterpretation of contract gradiation specification, and their failure to follow contract specifications in preparation of the stockpiling area," characterizing this as a "very unnecessary and unprofessional way to deal with a contractor." Later, in a September 30, 1997, letter to the Corps, plaintiff wrote: "Becho Incorporated would like to bring affidavits, or the people themselves, who have been on site during this contract, to show the unnecessary and slanderous way our employees and company have been treated during this contract."

9. Defendant makes much of the fact that Becho did not contemporaneously argue that Modification P00004 was a cardinal change, but rather merely complained that it had completed the work on the original contract and would not resort pile 1 without receiving further compensation. To be sure, in a September 30, 1997, letter to the Corps, Becho claimed that it had complet-

ed its work and would not comply with Modification P00004 because "contents of Modification 00004 fails to provide for the restockpiling costs." However, these assertions—that the prior contract was completed and that further work would not be performed without compensation— are hardly inconsistent with a claim that the modification worked a cardinal change, a change that, by definition, "effectively requires the contractor to perform duties materially different from those originally bargained for." *Allied Materials*, 569 F.2d at 563–64.

Moreover, courts have been hesitant to discount affidavits simply because there is some tension between the assertions therein and other documents in the record. This is perhaps best illustrated by the "sham" affidavit doctrine, under which courts have been willing to disregard affidavits that are contrary to prior deposition testimony by the same witness only where the conflict is square and unexplained. *Compare Perma Research and Development Co. v. Singer Co.*, 410 F.2d 572, 577–78 (2d Cir.1969) (rejecting the use of so-called "sham" affidavits that conflict squarely with the affiant's earlier deposition testimony) *with Thomas v. Roach*, 165 F.3d 137, 144 (2d Cir.1999) (refusing to apply this rule where the conflict with prior documents was "vague and inconclusive"); *Tippens v. Celotex Corp.*, 805 F.2d 949, 955 (11th Cir.1986) (allowing the use of affidavits inconsistent with prior deposition testimony provided the inconsistencies did not amount to an "irreconcilable conflict").

10. For example, a September 2, 1997, entry in Mr. Thomas field log indicates that a new Corps representative "is a lot better guy to talk to instead of Aguilar. He doesn't talk to people like you don't know anything or make you think that he think[s] you are a thief." Regarding the modification, an internal Corps memorandum, dated September 4, 1997, several weeks before Modification P00004 was issued, states: "The Contractor has recently indicated to our field representative that he does not propose to correct the defects found in the first pile since that rock has already been accepted by the Corps and payment made for 4322 cubic yards of rock."

preclude a party from highlighting the existence of genuine questions of fact by using affidavits asserting specific facts based on personal knowledge, solely because those facts do not first appear in some contemporaneous reports or other previously-generated documents. Defendant's contrary contention is simply incompatible with the case law.[11]

Commercial reality suggests that, in some circumstances, a contractor may wish to remain silent in the face of what it perceives to be abusive governmental conduct in order to get paid promptly or to maintain a valuable customer relationship. Indeed, plaintiff specifically alleges this was the case here. That such silence may constitute a waiver of certain claims—a subject dealt with below—is hardly doubted. And, of course, this silence may affect the weight given assertions or credibility ascribed to witnesses at trial. But, critically, the lack of prior corroboration does not, in and of itself, prevent this court from relying upon detailed affidavits that meet the requirements of RCFC 56 in concluding that genuine questions of fact exist

concerning how the government administered a contract. In the instant case, these affidavits constitute more than a "scintilla of evidence" in support of plaintiff's position; they do more than raise a "metaphysical doubt" as to material facts; rather, they present a distinct possibility that a reasonable fact-finder could rule in favor of the plaintiff.[12] In these circumstances, this court is on solid footing in concluding that these affidavits raise genuine and material questions of fact concerning whether Modification P00004 was a cardinal change and whether that modification, the conduct that led thereto and the subsequent termination for default were the result of abusive, or at least arbitrary and capricious, conduct.[13]

As presaged above, defendant also claims that if there was a cardinal change here, Becho waived that material breach by continuing to perform. Indeed, it is axiomatic that:

a material breach does not automatically and ipso facto end a contract. It merely

11. Various cases illustrate that affidavits need not be corroborated by other evidence in order to show a genuine issue of fact. *See, e.g., Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 284 (3d Cir.2000) (In Title VII action, failure to mention abusive conduct during prior deposition did not preclude affidavit from later alleging such conduct); *Danzer v. Norden Systems, Inc.,* 151 F.3d 50, 57 (2d Cir.1998) ("There is nothing in [Rule 56] to suggest that nonmovants' affidavits alone cannot—as a matter of law—suffice to defend against a motion for summary judgment"); *Jackson v. Duckworth,* 955 F.2d 21, 22 (7th Cir.1992) (reversing district court's ruling that petitioner's affidavit alone did not show genuine issues of material fact, stating "[b]ut an affidavit is evidence for purposes of determining whether a genuine issue of material fact exists"). *See also* "Summary Judgment Materials," 147 F.R.D. at 667–68 ("As long as the witness is willing to swear to personal knowledge of the party's conduct, it is inappropriate for the court effectively to usurp the [trier of fact's] function by resolving issues of credibility on a summary judgment motion.").

12. In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. at 250, 106 S.Ct. 2505, the Supreme Court provided significant additional guidance as to the evidentiary standard which trial courts should apply in ruling on a motion for summary judgment, indicating:

[The summary judgment] standard mirrors the standard for directed verdict under Federal Rule of Civil Procedure 50(a), which is that a

trial judge must direct a verdict if, under the governing law, there can be but one reasonable conclusion as to the verdict.

The Court in Anderson further stated that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the [non-movant]." *Id.* at 252, 106 S.Ct. 2505. *See also Matsushita,* 475 U.S. at 586, 106 S.Ct. 1348 (an "opponent must do more than simply show that there is some metaphysical doubt as to the material facts").

13. This conclusion is all the more compelling as defendant has failed to file any affidavits from the COR or other Corps officials that contradict the recitation of key facts in plaintiff's affidavits. *See Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) (summary judgment reversed where defendant failed to present affidavit denying essential aspect of plaintiff's case). Indeed, the welter of conflicting allegations, charges and counter-charges in this case cry out for live testimony, with a full opportunity for cross examination, during which the court will be able to observe closely the demeanor of the witnesses. *Cf.* FED. R. CIV. P. 56 advisory committee's note ("Where an issue as to a material fact cannot be resolved without observation of the demeanor of witnesses in order to evaluate their credibility, summary judgment is not appropriate."). Perhaps depositions, which have not yet occurred in this case, will also shed light on these factual issues.

gives the injured party the right to end the agreement; the injured party can choose between canceling the contract or continuing it.... If he elects ... to continue the contract, the obligations of both parties remain in force and the injured party may retain only a claim for damages for partial breach.

*Cities Serv. Helex, Inc. v. United States*, 543 F.2d 1306, 1313 (1976).[14] To the extent plaintiff argues that the actions of the COR during the original delivery of the stone, through the restacking of pile 2, and up to, *but not including*, Modification P00004, constituted independently either a material breach or a cardinal change, the court concludes that plaintiff has waived that point by continuing to perform the contract during the relevant periods. The same conclusion, however, does not obtain as to plaintiff's claim that Modification P00004 itself represented a cardinal change, because plaintiff plainly refused to perform what both parties admit is the essence of that modification, *to wit*, the resorting of pile 1.[15] That claim thus was *not waived by performance*. Moreover, the waiver doctrine does not preclude plaintiff from relying on the Corps' prior conduct from the outset of the subject contract in proving that Modification P00004 was a cardinal change. *Thermocor, Inc.*, 35 Fed.Cl. at 490 (court must inquire into the "events that led to the excess work").

### III. Conclusion

Based on the foregoing, the court concludes that material questions of fact exist that preclude entry of a partial summary judgment in favor of defendant.[16] Accordingly, defendant's motion for partial summary judgment is hereby **DENIED**.

---

**14.** *See also Green Management Corp.*, 42 Fed.Cl. at 431; *Morris v. United States*, 39 Fed.Cl. 7, 22 (1997); John Cibinic, Jr. & Ralph C. Nash, Jr., Administration of Government Contracts 399 (3d ed.1995) ("If a contractor accepts a change and performs the changed work without reservation, it cannot subsequently claim that the change was beyond the scope of the contract...").

**15.** Defendant argues that plaintiff waived its claim that Modification P00004 was a cardinal change when it continued to resort pile 2 after receiving Modification P00003, which required Becho to resort piles 1 and 2. Problems abound with this assertion. First, Modification P00003 was a proposed bilateral change that was never accepted by Becho and thus was legally ineffective. Second, although the parties have debated

when Modification P00003 was received by Becho, it clearly was received only in mid-September of 1997, shortly before Becho completed the resorting of pile 2, which work had commenced on August 6, 1997. Finally, both parties admit that the main focus of this litigation is on that portion of Modification P00004 requiring Becho to resort pile 1. Becho, however, never performed this task. In these circumstances, the court rejects the argument that Becho waived its claim that Modification P00004 was a cardinal change by performing some activities after it received Modification P00003.

**16.** For similar reasons, the court denies defendant's motion for partial summary judgment on its counterclaim.